**William O. SCHISM and Robert Reinlie, Plaintiffs,**

v.

**UNITED STATES of America and William Cohen as Secretary of Defense, Defendants.**

**No. 3:96CV349/RV.**

United States District Court, N.D. Florida, Pensacola Division.

Aug. 31, 1998.

J.D. Roy Atchison, U.S. Attorney Northern Dist. of Florida, Pensacola, FL, Shirley Wang, U.S. Dept. of Justice, Washington, DC, Martha Hirschfield, U.S. Dept. of Justice, Civil Div., Washington, DC, for U.S.

George Everette Day, Day and Meade, P.A., Fort Walton Beach, FL, for William O. Schism, Robert L. Reinley.

### ORDER

VINSON, Chief Judge.

Pending is the defendants' motion for summary judgment. (doc. 62) Also pending are the plaintiffs' counter-motion for partial summary judgment (doc. 68) and the plaintiffs' motion to certify class representation. (doc. 45)

## I. *BACKGROUND*

Plaintiffs William O. Schism and Robert L. Reinlie are retired veterans over 65 years of age, each of whom has served his country for over twenty years in the armed forces.[1] They retired in 1979 and 1968, respectively. Plaintiffs bring this suit alleging breach of contract and violation of their Fifth Amendment right to due process.

According to the plaintiffs, they joined and remained in the United States armed forces on the basis of promises by the armed forces that they would receive free lifetime medical care for themselves and their dependents. Plaintiffs allege that the medical treatment as promised was not subject to the restrictions of Medicare and Social Security, and

---

**1.** The plaintiffs have sought certification of a class of all military retirees, aged 65 and over, who are receiving social security, are enrolled in Medicare Part B, and who began their service or made service career decisions before 1956.

contend that such promises were part of recruiting manuals and other authoritative written representations.

Plaintiff Schism states in his affidavit that when he enlisted in the United States Navy in 1943 he was advised that he could retire at 20 years with free medical care for life. (doc. 67, ex. C) He was also advised of the availability of free medical care in boot camp. During his time in the Navy and the Air Force, Schism learned that the promise of free health care was common knowledge in the service. Plaintiff Reinlie states in his affidavit that when he entered the United States Army Air Corp in 1942, he was promised free lifetime medical care, and that such promises were also made in official recruiting documents. (doc. 67, ex. D)

The plaintiffs have also submitted affidavits from retired military men and women who served as recruiters for the Army and Navy before 1956. These former recruiters state in their affidavits that they counseled potential enlistees and reenlistees regarding the free medical care they would receive during service and after retirement. (doc. 67, ex. O, P, R, S, W). They also state that at the recruiting schools they attended, they were instructed to tell potential enlistees that after twenty years of service retirees would receive lifetime medical care for themselves and their dependents. Promises of lifetime medical care were also made after the enactment of Title 10, United States Code, Section 1074(b) in 1956. The plaintiffs have also submitted general written materials provided by the military service branches before 1956 which state that military retirees are entitled to medical treatment and hospitalization as a part of their retirement benefits.

The plaintiffs contend that the United States has breached its contract to provide them with free medical care as part of their retirement compensation.[2] Plaintiffs allege that while the United States fulfilled its obligations under the "contract" for many years by providing free health care, access to health care has recently been revoked or limited, and the plaintiffs have been forced to rely on Medicare, requiring payments by them and resulting in unanticipated out-of-pocket expenses. The plaintiffs further contend that the government's deduction of money from their social security payments to pay for the Medicare benefits constitutes a seizure of their property which violates their due process rights under the Fifth Amendment. They seek an order requiring the United States to cease deducting payments from their retired pay and to provide plaintiffs and their dependents the unlimited free medical care for which they allegedly contracted.

In my earlier order ruling on the defendants' motion to dismiss, the defendants' motion to dismiss the plaintiffs' contractual claim under the Little Tucker Act was denied as to plaintiffs who began their service or made service decisions prior to the enactment of Section 1074 in 1956. The plaintiffs were also allowed to continue with their claim under the Fifth Amendment concerning an implied contractual vesting of their asserted retirees' benefits prior to 1956. Plaintiffs' claims of age discrimination and for mandamus were dismissed. Both sides have moved for summary judgment as a matter of law, recognizing that the material facts are not really disputed.

**2.** To provide an improved and uniform program for members and certain former members of the armed services, Congress established the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"). CHAMPUS participants pay a portion of their medical bills and the government covers the rest.

In 1994, the Defense Department developed and implemented a health benefit option for beneficiaries eligible for health care known as "Tricare," which is modeled on health maintenance organization (HMO) plans. *See* 32 C.F.R. 199.17; P.L. 103–160 Sec. 731, 107 Stat. 1696; P.L. 103–139 Sec. 8025, 107 Stat. 1443. Retirees who qualify for Medicare under the Social Security Act, 42 U.S.C. § 1395c *et seq.*, are not eligible for CHAMPUS or Tricare benefits. 10 U.S.C. § 1086(d). Medicare Part A provides basic protection against the costs of hospital care, related post hospital care, home health services and hospice care. 42 U.S.C. § 1395c. Medicare Part B provides certain physicians' services, home health service, laboratory services, and other services not covered under Part A. 42 U.S.C. § 1395k. Retirees are automatically entitled to protection under Part A, but must enroll in Part B to receive those benefits. All Part B enrollees must pay a monthly premium via deduction from their social security benefits. 42 U.S.C. § 1395s.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. As the Supreme Court of the United States has instructed, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

On summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1502 (11th Cir.1993). Nevertheless, the non-moving party must provide more than a mere "scintilla" of evidence supporting his position, for if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson, supra,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11, 91 L.Ed.2d at 212; *Johnson v. Fleet Finance, Inc.,* 4 F.3d 946, 949 (11th Cir.1993). Furthermore, although the non-moving party must designate "specific facts showing that there is a genuine issue for trial," the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties. *See Hargett v. Valley Fed. Sav. Bank,* 60 F.3d 754, 763 n. 9 (11th Cir.1995) (quoting *Celotex Corp., supra,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274, (1986)); *Clinkscales v. Chevron USA, Inc.,* 831 F.2d 1565, 1570 (11th Cir.1987).

### B. Discussion

#### (1) The Little Tucker Act Claim for Breach of Contract

The plaintiffs claim that an implied contract exists between the plaintiffs and the government that obligates the government to provide the plaintiffs and their families with free medical care in military facilities for the plaintiffs' lifetime. According to the plaintiffs, the alleged offer was part oral and part written, was accepted by the plaintiffs, and was performed by the United States for several generations—until the implementation of "Tricare." The defendants contend that military retirees' eligibility for health care is governed exclusively by statute, and that the plaintiffs, who retired after 1956, are eligible for health care only as provided by Title 10, United States Code, Section 1074(b). The defendants further contend that even if the plaintiffs' eligibility was determined by the regulations in place at the time they joined the armed services or made career military service decisions, the regulations at that time would not have entitled the plaintiffs or their dependents to free and unconditional medical care at military facilities. Finally, the defendants contend that they could not have entered into implied-in-fact contracts with the plaintiffs, since: (1) the plaintiffs executed express contracts governing their pay and benefits when they enlisted; and (2) government agents would not have had actual authority to promise benefits that were inconsistent with the regulatory scheme in place at the time the promises were allegedly made to the plaintiffs.

The plaintiffs' contract claim is brought under the Little Tucker Act, which provides concurrent jurisdiction in the United States district courts and the Claims Court for claims against the United States founded "upon any express or implied contract with the United States" that do not exceed $10,000 in amount. 28 U.S.C. § 1346(a)(2). An implied-in-fact contract with the government requires mutuality of intent to contract, consideration, and an unambiguous offer and acceptance. *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478 (Fed.Cir.1994); *Helash v. Ballard,* 638 F.2d 74, 75 (9th Cir.1980). The plaintiff must also show that the officer whose conduct is relied upon had actual authority to bind the government in contract. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Mega Construction Co. v. United States,* 29 Fed.Cl. 396 (Fed.Cl.1993). Mutuality is inferred "from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Kollsman v. United States,* 25 Cl.Ct. 500, 514 (Cl.Ct.1992).

The defendants initially contend that the plaintiffs' eligibility for retirement health care is exclusively governed by Title 10, United States Code, Section 1074(b), and that any statutes or regulations prior to 1956 are irrelevant. In 1956, Congress passed the Dependents' Medical Care Act [Pub.L. No. 84–569, 70 Stat. 250], with Section 301(b) of the Act [later codified at 10 U.S.C. § 1074(b) ] providing that:

> Medical and dental care in any medical facility of the uniformed services *may,* under regulations prescribed jointly by the Secretaries of Defense and Health, Education and Welfare, *be furnished upon request and subject to the availability of space, facilities, and capabilities of the medical staff,* to retired members of the uniformed services. (Emphasis added).

The relevant portion of Section 1074(b) currently provides, in slightly different language, that "a member or former member of a uniformed service who is entitled to retired or retainer pay ... may, upon request, be given medical ... care in any facility of any uniformed service, subject to the availability of space and facilities and the capabilities of the medical ... staff." It is evident that the operative language of Section 1074(b) remains essentially the same as enacted in 1956.

It is well established that the benefits owing to military service members are governed by statutes and regulations. *See, e.g., Lavin v. Marsh,* 644 F.2d 1378, 1383 (9th Cir.1981); *Earnest v. United States,* 33 Fed. Cl. 341, 344 (Fed.Cl.1995). For those retirees who began service after the enactment of Section 1074(b) in 1956, the limitations imposed on benefits by the statute override any representations made by the government or its agents, since any promises in contradiction of the statute would be beyond the authority of government agents to carry out. However, the critical issue for purposes of the present motion concerns the time period before the enactment of Section 1074(b) in 1956. At the time my order was entered ruling on the defendants' motion to dismiss, neither party had identified any statute or regulation pre-dating 1956 that addressed the medical benefits of military retirees. It is those pre–1956 statutes and regulations that affect the viability of the plaintiffs' claims, rather than Section 1074(b).

The defendants also argue that the plaintiffs' enlistment agreements override any alleged implied-in-fact contract between the government and the plaintiffs. In the oath and certification of enlistment in the Army executed by plaintiff Reinlie in 1942, Reinlie agreed to "accept from the United States such bounty, pay, rations, and clothing as are or may be established by law." (App. B, p. 27) The agreement signed by plaintiff Schism when enlisting in the Navy stated "I also oblige myself, during such service, to comply with and be subject to such laws, regulations, and articles for the government of the Navy as are or shall be established by the Congress of the United States or other competent authority...." (App. A, p. 90) The enlistment agreements signed by the plaintiffs say nothing about retirement benefits. It is true that an "implied-in-fact contract cannot exist if an express contract already covers

the same subject matter." *Trauma Service Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). However, the enlistment agreements signed by the plaintiffs do not cover the subject matter at issue here—that is, health benefits for retirees.

■ There is no question that factual representations were made to members of the military, however, concerning the retirees' health care. The issue simply is whether those representations are contractually binding. The defendants' primary argument is that under the pre–1956 regulations governing military retiree health care, military recruiters did not have actual authority to bind the government to promises of free lifetime health care. The defendants conclude that any representations made to the plaintiffs by recruiters at the time the plaintiffs joined the armed services cannot form the basis of an implied-in-fact contract with the government.

The defendants rely on the case of *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In that case, farmers purchased crop insurance from the Federal Crop Insurance Corporation ("FCIC"). When their crops were destroyed, the FCIC refused to pay the loss upon learning that much of the destroyed acreage had been reseeded wheat, which was uninsurable under FCIC's regulations. The farmers claimed that they were not aware of these regulations, and that FCIC agents had represented to them that their crops were insurable. The Supreme Court held that the FCIC was not liable for the loss:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. . . . And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

332 U.S. at 384, 68 S.Ct. at 3. *See Trauma Service Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). Since the *Merrill* decision, the lower courts have consistently held that the government is not bound by a contract entered into on its behalf by a government agent who exceeds his authority:

> When an agent of the government enters a contract that does not satisfy statutory or regulatory conditions, the courts cannot bind the government to the contract . . . If the rule were otherwise, the government would be put at risk every time its agents failed to follow instructions to the last detail, and their mistakes could impermissibly decrease the public treasury to the detriment of every taxpayer.

*Augusta Aviation, Inc. v. United States,* 671 F.2d 445, 449 (11th Cir.1982). *See City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990).[3]

The determination of whether recruiters had actual authority must be made against the backdrop of the relevant pre–1956 statutes and regulations. I also must examine this issue on the basis of the record in this case, which only has two plaintiffs. In examining the regulations pertaining to the plaintiffs, it is helpful to outline the plaintiffs' service careers. Plaintiff Schism enlisted in the United States Navy in April 1943, and was honorably discharged in February 1946. In February 1947, Schism reenlisted in the Navy Reserve and was placed on inactive duty. Schism was discharged from the Navy Reserve on December 2, 1947, and enrolled in the Army's Reserve Officer Training Corps program. Schism resumed service with a five-year appointment to the United States Air Force Reserve in 1949. He received an indefinite appointment on February 20, 1951, and served until his voluntary release from active duty on June 27, 1952. His Air Force serve alternated from active to inactive status until June 21, 1956, when he

---

3. The government also relies on the Anti–Deficiency Act [31 U.S.C. § 1341]. Generally, the Act prohibits government officials and employees from making expenditures or incurring obligations in excess of available appropriations or in advance of appropriations. *Cessna Aircraft Co. v. Dalton,* 126 F.3d 1442, 1448 (Fed.Cir.

1997). As far as government contracts are concerned, the Act "bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation." *Hercules Inc. v. United States,* 516 U.S. 417, 426, 116 S.Ct. 981, 987, 134 L.Ed.2d 47 (1996).

began active service. His service continued until his retirement on August 31, 1979. (doc. 62, ex. A)

Plaintiff Reinlie enlisted in the United States Army on June 24, 1942, and continued to serve on active duty until his separation from the Army on October 21, 1945. Reinlie entered the Air Force on May 1, 1951. Reinlie received an indefinite term appointment on January 5, 1953, and served continuously until his retirement from the Air Force in 1967. (doc. 62, ex. B)

In 1943, the year Schism enlisted in the Navy, health care for retired Navy personnel was governed by United States Navy Regulations ("NAVREGS") from 1920. Article 1830 of the NAVREGS provided:

> Authority for admission to an Army and Navy general hospital may be obtained by all persons of the Navy and Marine Corps, on the active and retired lists, from the Surgeon General of the Navy on the report of a board of medical survey or, when that is impracticable, on the certificate of a naval medical officer, clearly stating the applicant's disability.... The length of treatment in hospital will be determined by the medical officer in command thereof. (doc. 62, ex. C)

Importantly, the cost of treatment at a military hospital was deducted from the patient's pension. *See* Article 1832. Additional guidance was provided by the Navy's Bureau of Medicine and Surgery, which published the Manual of the Medical Department of the United States Navy ("MEDMAN"). Under Section 3168 of the 1943 MEDMAN:

> Retired officers and enlisted men, inactive, are not entitled to civilian medical and hospital treatment at Government expense. They are entitled to treatment in naval hospitals and by naval medical officers when available upon application, but no expenses for travel in connection with such treatment may be allowed. (doc. 62, ex. C, p. 56)

Section 4132.1 of the 1945 MEDMAN provided that "[a] retired officer of the Regular Navy or Marine Corps not on active duty shall, if in need of hospital care, be admitted to any naval hospital upon the application of the individual and presentation of suitable identification." In 1952, the MEDMAN was revised to provide that retirees:

> "[M]ay be, upon request, furnished required medical and dental care and adjuncts thereto in any medical facility of a uniformed service ... subject to mission requirements and the availability of space, facilities, and capabilities of the medical staff or dental staff as determined by the local medical or dental authorities." (§ 20–6, MEDMAN 1952)

In 1942, when plaintiff Reinlie enlisted in the United States Army, health care for retired soldiers was governed by Army Regulations ("AR") 40–505 and 40–590. Paragraph 2(b)(2) of AR 40–505 provided that "the Army will, usually through its own facilities, provide medical attendance to ... [p]ersons who are on the retired list of the Regular Army and who report in person at any Army dispensary or hospital, provided sufficient accommodations are available for their treatment." (doc. 62, ex. D, pp. 92–93) Paragraphs 6 and 6(b)(1) of AR 40–590 provided:

> When suitable facilities for hospitalization are available, sick and injured persons as enumerated in (b) below may be admitted to Army hospitals....
>
> \* \* \* \* \* \*
>
> (b)(1) Officers, Army nurses, warrant officers, cadets of the United States Military Academy, pay clerks, and enlisted men in the Army; also contract surgeons serving full time. The admission of retired personnel on inactive status will be limited to cases which in the judgment of the commanding officer of the hospital will be benefitted by hospitalization for a reasonable time. Those requiring merely domiciliary care by reason of age or chronic invalidism will not be admitted.... (doc. 62, ex. D, pp. 101–102)

AR 40–505 and AR 40–590 were still in effect in essentially the same form at the time Schism entered the Army in 1947. (doc. 62, p. 104)

The Air Force followed Army regulations from its formation in 1947 until Air Force Regulation ("AFR") 160–73 was promulgated in 1951. *See* National Security Act of 1947,

P.L. No. 253, 61 Stat. 495 (1947). Paragraph (14)(h) of AFR 160–73, which was in effect up until Schism entered continuous active service in 1956, provided:

The hospitalization of retired inactive Armed Forces personnel listed below will be limited to cases which in the judgment of the hospital commander will be benefitted by hospitalization for a reasonable length of time. Persons desiring medical care must furnish evidence of eligibility satisfactory to the hospital commander concerned. Those requiring merely domiciliary-type care because of age or chronic invalidism will not be admitted.

(App. E, p. 119)

In opposition, the plaintiffs refer to Chapter 21 of the 1922 MEDMAN. This chapter outlines how the Naval Hospital Fund was established. By the Act of March 2, 1799 (Sec. 4808, Rev. Stat.), the Secretary of the Navy was authorized to deduct 20 cents per month from the pay of each officer, seaman and marine for the benefit of a Naval Hospital Fund. The Naval Hospital Fund was established on February 26, 1811 [2 Stat. 650], and additional statutes enacted in 1832 funded the construction of hospitals in various locations, including a hospital in Pensacola, Florida. 4 Stat. 570 (1832) (doc. 96, ex.) The Fund was abolished in 1943.[4]

The plaintiffs also rely on publications such as the *Bluejackets' Manual* of the United States Navy and the Department of the Army *Field Manual.* The 1943 and 1944 editions of the *Bluejackets' Manual* both state that retired enlisted men are entitled to medical treatment and hospitalization. (doc. 67, ex. E) A publication from the same time period entitled *"An Officer's Career in the Peacetime Navy"* states that "[r]etired officers are entitled to medical care and hospitalization by naval medical facilities." (doc. 67, ex. G) The 1952 edition of the *"Soldier's Guide"* [the Department of the Army Field Manual], states that retired soldiers are entitled to "commissary, post exchange privileges, medical care, and hospitalization." (doc. 67, ex. F, at p. 127)[5] According to the defendants, the fact that recruiters made assurances of lifetime health care, and even that they were instructed to make such promises, is not legally significant, since the regulations before 1956 did not entitle retirees to unconditional care. The plaintiffs respond that because the regulations do not explicitly state the terms of eligibility for medical care after retirement, the representations made by recruiters supplied missing terms of the regulations and provided the basis for implied-in-fact contracts.

 It is obvious from the numerous affidavits supplied by the plaintiffs that during the period before 1956, recruiters made promises to potential recruits that they could obtain lifetime medical care for themselves and their dependents by joining the armed forces and fulfilling certain service obligations. However, the regulations cited by both sides as being in effect before 1956 do not establish such a right to free lifetime medical care. Instead, the regulations provide for care upon a space available basis, or upon the determination of the medical officer in charge of the facility. My own research has not revealed any law or regulatory authority different from that cited by the parties in this case. It is true that many of the affidavits in the record were provided by former military recruiters, who stated that they thought that free lifetime health care was a benefit of military service. But under *Federal Crop Ins. Corp. v. Merrill, supra,* even where the government agent making a representation is unaware that the representation is inaccurate, the government is not bound by such representations. *Merrill* places the burden of determining the extent

---

**4.** The plaintiffs argue that the fact that there were statutes authorizing the creation of the Naval Hospital Fund contradicts the defendants' position that 10 U.S.C. § 1074(b) was the first statute passed by Congress addressing health care benefits for retirees. However, the effect of these statutes is merely to authorize the Secretary of the Navy to prepare rules and regulations concerning naval hospitals and to make appropriations for the construction of naval hospitals.

They do not specifically address retiree health benefits.

**5.** Although not within the relevant time period, the Bluejacket's Manual from 1918 states that "[d]uring your life, you receive free medicine, medical attendance, and hospital service whenever required." (doc. 95, ex.)

of the agent's authority on the person dealing with the government. Because the representations made by the recruiters were in conflict with the regulations then in place, such representations cannot be said to have been an interpretation of or addition to such regulations. While the plaintiffs argue that the government provided free health care to retirees until the adoption of the Tri–Care program in the 1990's, the gratuitous provision of such services is insufficient, without more, to form the basis for an implied contract. *See, e.g., Hoffman v. City of Warwick,* 909 F.2d 608, 616 (1st Cir.1990), *cert. denied,* 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 105 (1985).

I must conclude that the plaintiffs certainly have a strong equitable argument that the government should abide by its promises. Regrettably, the law does not permit me to order the United States to do so. Under the Constitutional separation of powers, relief for the plaintiffs must come from Congress and not from the Judiciary.

**(2) Fifth Amendment**

■ The plaintiffs' second claim is that free post-retirement medical care is part of the deferred compensation that they bargained for upon entering the military and, therefore, is a vested property right, irrespective of the provisions of Title 10, United States Code, Section 1074(b). According to the plaintiffs, requiring retirees over the age of 65 to use Medicare for their health care needs is a retroactive reduction of their rights, and they are entitled to the benefit of their implied contract.

■ Where the government takes legislative action that impairs a contract to which it is a party, the impairment of such contractual rights may be protected in some cases by the Fifth Amendment. *See Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934) (invalidating legislation repudiating the government's obligation to pay war risk insurance benefits to veterans); *Larionoff v. United States,* 533 F.2d 1167 (D.C.Cir.1976) (entitlement of plaintiffs to veterans reenlistment bonuses not impaired by statutory repeal of bonus enlistment program), *aff'd,* 431 U.S. 864, 97

S.Ct. 2150, 53 L.Ed.2d 48 (1977). However, the enactment of a statute reducing benefits does not constitute a taking without compensation where the benefits are noncontractual in nature. *See, e.g., Jones v. Reagan,* 748 F.2d 1331, 1339 (9th Cir.1984) (statute terminating right of disabled merchant seaman to free medical care in government facilities did not constitute taking without compensation; hospital care was noncontractual benefit).

■ As discussed above, the regulations in place before 1956 did not establish free lifetime medical care for retirees; instead, those regulations provided that care would be provided if space were available, or at the discretion of the facility's medical officer. Section 1074(b), enacted in 1956, continued the policy established by the regulations in existence at the time of the plaintiffs' enlistment. In the absence of a contractual right to free lifetime medical care, there is no taking without compensation that would violate the Fifth Amendment, since preferences or benefits conferred upon veterans do not give rise to compensable property rights. *Hoffman v. City of Warwick,* 909 F.2d 608, 616 (1st Cir.1990); *Zucker v. United States,* 758 F.2d 637 (Fed.Cir.), *cert. denied,* 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 105 (1985).

**III. *CONCLUSION***

For the reasons discussed above, the defendants' motion for summary judgment is GRANTED. (doc. 62) The plaintiffs' counter-motion for partial summary judgment is DENIED. (doc. 68) The plaintiffs' motion to certify class representation is DENIED, as moot. (doc. 45) The Clerk shall enter judgment for the defendant, but no costs shall be taxed.