MAYER, Chief Judge.
 

 William 0. Schism and Robert L. Reinlie (the retirees) appeal the grant of summary judgment of the United States District Court for the Northern District of Florida in favor of the government that they are not entitled to free, lifetime health care, and the denial of summary judgment to the retirees. The district court also denied their motion for certification of a class of all military retirees, aged 65 and over, who are receiving social security, are enrolled in Medicare Part B, and who began their service or made service career decisions before 1956, which they do not appeal.
 
 See Schism v. United States,
 
 19 F.Supp.2d 1287 (N.D.Fla.1998). Because the district court erroneously concluded as a matter of law that the retirees did not prove an implied-in-fact contract with the government, we reverse and remand for determination of damages.
 

 Background
 

 Schism and Reinlie are retired veterans over 65 years of age, who each had more than twenty years of active military service. They began their service in 1943 and 1942 and retired in 1979 and 1968, respectively. The retirees contend that the government induced service in the military with the promise that, upon retirement, service members and their dependents would be entitled to free, lifetime health care. They argue that having fulfilled their part of the bargain by serving for twenty or more years, they have a contractual right, as well as a property right under the Fifth Amendment arising from their contractual right, to free, lifetime health care. The retirees contend that the government reneged on its promise and failed to provide the promised health care benefits without cost.
 

 In rejecting the retirees’ claims, the district court observed that “[i]t is obvious ... [that] recruiters made promises to potential recruits that they could obtain lifetime medical care for themselves and their dependents by joining the armed forces and fulfilling certain service obligations,”
 
 id.
 
 at 1294, and “[t]here is no question that factual representations were made.... The issue simply is whether those representations are contractually binding.”
 
 id.
 
 at 1292. The government admits that the “recruiters made good faith representations to potential recruits that, upon retirement, they and their dependents would
 
 *1283
 
 receive free, lifetime medical care
 
 ..
 
 and that Congress has acknowledged a moral obligation to “provide health care to military retirees who believed they were promised lifetime health care in exchange for a lifetime of military service.” S.Rep. No. 105-29, at 295 (1997). The district court held, however, that the government’s representations were not contractually binding because they were in conflict with the military regulations that determined the health care benefits of the retirees and their dependents.
 

 Prior to 1956, the military departments
 
 [1]
 
 regulated medical benefits for retired members and their dependents pursuant to 5 U.S.C. § 301 which provides that “[t]he head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property.” 5 U.S.C. § 301 (1994);
 
 see also Chrysler Corp. v. Brown,
 
 441 U.S. 281, 309, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (“The antecedents of § 301 go back to the beginning of the Republic, when statutes were enacted to give heads of early Government departments authority to govern internal departmental affairs.”). With regard to the regulations of the different military departments in which the retirees served, the district court said:
 

 In 1943, the year Schism enlisted in the Navy, health care for retired Navy personnel was governed by United States Navy Regulations (“NAVREGS”) from 1920. Article 1830 of the NA-VREGS provided:
 

 Authority for admission to an Army and Navy general hospital may be obtained by all persons of the Navy and Marine Corps, on the active and retired lists, from the Surgeon General of the Navy on the report of a board of medical survey or, when that is impracticable, on the certificate of a naval medical officer, clearly stating the applicant’s disability.... The length of treatment in hospital will be determined by the medical officer in command thereof. [Article 1832 NA-VREGS (1920).]
 

 Importantly, the cost of treatment at a military hospital was deducted from the patient’s pension.
 
 See
 
 Article 1832. Additional guidance was provided by the Navy’s Bureau of Medicine and Surgery, which published the Manual of the Medical Department of the United States Navy (“MEDMAN”). Under Section 3168 of the 1943 MEDMAN:
 

 Retired officers and enlisted men, inactive, are not entitled to civilian medical and hospital treatment at Government expense. They are entitled to treatment in naval hospitals and by naval medical officers when available upon application, but no expenses for travel in connection with such treatment may be allowed. [§ 3168 MED-MAN (1943).]
 

 Section 4132.1 of the 1945 MEDMAN provided that “[a] retired officer of the Regular Navy or Marine Corps not on active duty shall, if in need of hospital care, be admitted to any naval hospital upon the application of the individual and presentation of suitable identification.” In 1952, the MEDMAN was revised to provide that retirees:
 

 “[M]ay be, upon request, furnished required medical and dental care and adjuncts thereto in any medical facility of a uniformed service ... subject to mission requirements and the availability of space, facilities, and capabili
 
 *1284
 
 ties of the medical staff or dental staff as determined by the local medical or dental authorities.” (§ 20-6, MED-MAN 1952)
 

 In 1942, when plaintiff Reinlie enlisted in the United States Army, health care for retired soldiers was governed by Army Regulations (“AR”) 40-505 and 40-590. Paragraph 2(b)(2) of AR 40-505 provided that “the Army will, usually through its own facilities, provide medical attendance to ... [p]ersons who are on the retired list of the Regular Army and who report in person at any Army dispensary or hospital, provided sufficient accommodations are available for their treatment.” [ ] Paragraphs 6 and 6(b)(1) of AR 40-590 provided:
 

 When suitable facilities for hospitalization are available, sick and injured persons as enumerated in (b) below may be admitted to Army hospitals ....
 

 * * * * *
 
 *
 

 (b)(1) Officers, Army nurses, warrant officers, cadets of the United States Military Academy, pay clerks, and enlisted men in the Army; also contract surgeons serving full time. The admission of retired personnel on inactive status will be limited to cases which in the judgment of the commanding officer of the hospital will be benefited by hospitalization for a reasonable time. Those requiring merely domiciliary care by reason of age or chronic invalidism will not be admitted.... [AR 40-590 ¶¶ 6, 6b(l) (1935).]
 

 AR 40-505 and AR 40-590 were still in effect in essentially the same form at the time Schism entered the Army in 1947.
 

 The Air Force followed Army regulations from its formation in 1947 until Air Force Regulation (“AFR”) 160-73 was promulgated in 1951.
 
 See
 
 National Security Act of 1947, P.L. No. 253, 61 Stat. 495 (1947). Paragraph (14)(h) of AFR 160-73, which was in effect up until Schism entered continuous active service in 1956, provided:
 

 The hospitalization of retired inactive Armed Forces personnel listed below will be limited to cases which in the judgment of the hospital commander will be benefited by hospitalization for a reasonable length of time. Persons desiring medical care must furnish evidence of eligibility satisfactory to the hospital commander concerned. Those requiring merely domiciliary-type care because of age or chronic invalidism will not be admitted. [AFR 160-73 ¶ 14(h) (1951).]
 

 Schism,
 
 19 F.Supp.2d at 1292-94. In 1947, the MEDMAN was amended to replace a section which provided that retirees “may” be admitted to Navy hospitals with a provision stating that Naval retirees “shall” be entitled to admittance to Naval hospital provided they demonstrate a need for hospital care. MEDMAN §§ 5132.1, 4132.2 (1945) (as amended June 1947).
 

 “[I]t is those pre 1956 statutes and regulations that affect the viability of the plaintiffs’ claims, rather than Section 1074(b).”
 
 Schism,
 
 19 F.Supp.2d at 1291 (rejecting the government’s argument that the Dependents’ Medical Care Act, Pub.L. No. 84-569, 70 Stat. 250 (codified in relevant part at 10 U.S.C. § 1074(b)), precludes the retirees’ contractual claim).
 

 In addition to the regulatory scheme, the district court examined other publications which reiterate some of the same factual representations, and provide an historical overview of the actions of the government, with regard to retired member’s health care. The government arranged for care of sick and disabled seamen beginning as early as 1798, with the creation of the Naval Hospital Fund.
 
 See
 
 
 *1285
 
 § 21-1 MEDMAN (1922). In 1832, Congress appointed the Secretary of the Navy as sole trustee of this fund and authorized him to prescribe regulations for naval hospitals.
 
 See Schism,
 
 19 F.Supp.2d at 1294 n. 4. Because the amounts credited to the fund were not always sufficient, from time to time Congress appropriated funds to meet the requirements of the Navy.
 
 See
 
 4 Stat. 570 (1832). In 1884, during a conference on the Army Appropriations Bill, the House of Representatives conditioned its agreement to an increased appropriation for the Army’s medical department upon the addition of a proviso that “the medical officers of the Army and contract surgeons shall whenever practicable attend the families of the officers and soldiers free of charge.” 15 Cong. Rec. 5692-93 (1884). In addition, the retirees submitted a recruiting letter and brochure that the Secretary of the Navy sent in 1945 to Naval reserve officers which promised free, lifetime medical care upon retirement and included the value of those health care benefits in its calculation of “a Naval officer’s earning power” to induce those officers to remain on active duty after World War II.
 

 In 1956, Congress enacted the Dependents’ Medical Care Act, Pub.L. No. 84-569, 70 Stat. 250 (codified in relevant part at 10 U.S.C. § 1074(b)), which provided that: “Medical and dental care in any medical facility of the uniformed services may, under regulations prescribed jointly by the Secretaries of Defense and Health, Education and Welfare, be furnished upon request and
 
 subject to the availability of space, facilities, and capabilities of the medical staff, to retired members of the uniformed
 
 services.” 10 U.S.C. § 1074(b) (emphasis added);
 
 see also
 
 10 U.S.C. § 1076(b) (subjecting medical and dental care for dependents of retirees to the same restrictions). Pursuant to this statute, health care benefits for retirees became subject to the availability of space, facilities, and staff capabilities at military medical facilities. As demand for medical care exceeded the capacity of military medical facilities, some retirees and their dependents were turned away based on this statutory provision.
 

 In 1966, Congress enacted 10 U.S.C. § 1086, which authorized military departments to contract for the provision of civilian health care for retirees and their dependents. Pursuant to this statute, upon reaching age 65, retired members and dependents lose their eligibility for this health care and must rely on the health care benefits provided through Medicare under the Social Security Act. Medicare benefits consist of two parts. Part A, to which persons 65 or older are automatically entitled, provides basic hospital insurance.
 
 See
 
 42 U.S.C. § 1395c (1994). Part B provides certain physician’s services, home health services, laboratory services, and other services not covered under Part A.
 
 See id.
 
 § 1395k. To obtain benefits under Part B, retirees must enroll, and monthly premiums are deducted from the retiree’s social security payments.
 
 See id.
 
 §§ 1395j, 1395s. In 2000, Congress revisited the issue of health care for military retirees and passed legislation to provide health care for Medicare-eligible military retirees and their families. Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, Pub.L. 106-398, § 712, 114 Stat. 1654, 1654A-426-33 (2000).
 
 See also
 
 146 Cong. Rec. H9642 (daily ed. Oct. 11, 2000) (“This conference report provides permanent lifetime TRI-CARE eligibility for Medicare-eligible military retirees and their families beginning in fiscal year 2002.... ”).
 

 Discussion
 

 We review the district court’s grant of summary judgment
 
 de novo, T & M Distributors, Inc. v. United States,
 
 185 F.3d 1279, 1282 (Fed.Cir.1999), drawing reasonable inferences from the evidence in
 
 *1286
 
 favor of the non-movants, Schism and Reinlie.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When reviewing a district court’s denial of summary judgment, we look for an abuse of discretion.
 
 SunTiger, Inc. v. Scientific Research Funding Group,
 
 189 F.3d 1327, 1333, 51 USPQ2d 1811, 1814-15 (Fed.Cir.1999).
 

 The retirees contend that the government breached its implied-in-fact contract with them by requiring them to advert to health care benefits under Medicare. An implied-in-fact contract is one “founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit undei'standing.”
 
 Baltimore & Ohio R. Co. v. United States,
 
 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923);
 
 see also Hercules, Inc. v. United States,
 
 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). To prove an implied contract with the government, the retirees must show (1) mutuality of intent to contract, (2) consideration, (3) unambiguous offer and acceptance, and (4) that the representative whose conduct is relied upon had actual authority to bind the government.
 
 See City of Cincinnati v. United States,
 
 153 F.3d 1375, 1377 (Fed.Cir.1998);
 
 City of El Centro v. United States,
 
 922 F.2d 816, 820 (Fed.Cir.1990).
 

 (1)
 
 Mutuality of Intent to Contract
 

 In order to recruit, train, and maintain a military force, the secretaries of the military departments are delegated authority to create compensation and benefits packages for service members.
 
 See
 
 5 U.S.C. § 301. The military has used promises of free, lifetime health care to recruit and retain personnel to perform hazardous duties, often for less pay than they could have received in the civilian sector. The government concedes that “recruiters made good faith representations to potential recruits that, upon retirement, they and their dependents would receive free, lifetime medical care.” In fact, the record shows that the Army made these promises in its recruiting brochures as recently as the 1990’s.
 
 See
 
 “Army Benefits” brochure, Department of the Army, U.S.G.P.0.1992, 643-711 (“Health care is provided to you and your family members while you are in the Army, and for the rest of your life if you serve a minimum of 20 years of active Federal service to earn your retirement.”).
 

 Based on the Secretary of the Navy’s letter in 1945, it is apparent that the recruiters made these promises at the direction of the secretaries. In determining whether the government intended to contract, we presume that the secretaries carried out their duties in good faith and in accordance with law when making these promises.
 
 See United States v. Chemical Foundation, Inc.,
 
 272 U.S. 1, 15, 47 S.Ct. 1, 71 L.Ed. 131 (1926) (Government officials are presumed to have “properly discharged their official duties.”);
 
 T & M Distributors,
 
 185 F.3d at 1285 (“[Government officials are presumed to act in good faith....”). Because the secretaries made these offers in furtherance of their statutory duties to recruit and retain, we may presume that they intended to be contractually bound because a contrary intent would degrade their long-term ability to recruit new service members.
 
 See Lynch v. United States,
 
 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (“Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors.”); 146 Cong. Rec. H7059 (daily ed. July 26, 2000)
 
 *1287
 
 (statement of Rep. Bartlett) (“The recruitment brochures promised them and their family lifetime care in a military facility. We have broken that promise, and we are paying a heavy price for having broken that promise. Three of the services are now unable to meet their recruitment goals, and that is partly because when prospective enlistees confer with their father or their uncle or their grandfather, they frequently get the advice that T am not sure that you can-believe what they are telling you, because they did not keep their promise to me.’ We are having problems with retention for exactly the same reason, because our young men and worn- ■ en in the military are not sure that what we have now promised them is going to be there after they retire because we have broken our promise to their elders.”). The retirees submitted affidavits stating that they served twenty or more years in military service with the expectation of free, lifetime medical care and describing how the government provided these benefits until 1995. They intended their actions to be in performance of a binding contract between them and the government.
 

 (2)
 
 Consideration
 

 There was consideration in the mutuality of obligation: the retirees serve in the armed forces for twenty or more years; the government provides free health care to them and their dependents for the remainder of their lives. In
 
 Barker v. Kansas,
 
 503 U.S. 594, 604, 112 S.Ct. 1619, 118 L.Ed.2d 243 (1992), the Supreme Court held that for purposes of state taxation, military retirement benefits are to be considered deferred compensation for past services. Similarly, in this case, free, lifetime health care benefits are a deferred component of the retirees’ compensation in consideration of their continuance in military service for at least twenty years.
 

 No one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits they had expected to be able to earn.
 
 Cf. Bell v. United States,
 
 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961);
 
 United States v. Dickerson,
 
 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). It is quite a different matter, however, for Congress to deprive a service member of pay due for services already performed, but still owing. In that case, the congressional action would appear in a different constitutional light.
 
 Cf. Lynch v. United States,
 
 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934);
 
 Perry v. United States,
 
 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935).
 

 United States v. Larionoff,
 
 431 U.S. 864, 879, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977).
 

 (3)
 
 Unambiguous Offer and Acceptance
 

 The retirees submitted affidavits from former recruiters describing the specific offers made to prospective recruits and service members to persuade them to enlist, reenlist or to continue their military career until retirement, in some cases indicating that the benefits should be considered as part of their compensation.
 
 See
 
 Border Aff. (“I specifically remember one incident that has always stood out in my mind. On an [Inspector General] Inspection in January 1949, [several officers] gave eight recruiters in Denver a talk on the benefits of permanent health care and free medicine that we would be entitled to for the rest of our lives. We were told that we had to consider this as a
 
 part of our pay.”).
 
 According to the district court, “[i]t is obvious ... recruiters made promises to potential recruits that they could obtain lifetime medical care for themselves and their dependents by joining the armed forces and fulfilling certain service obligations.”
 
 Schism,
 
 19 F.Supp.2d at 1294.
 

 During last year’s debates surrounding the 2001 Defense Authorization Act, the
 
 *1288
 
 offers of free, lifetime health care made to retirees such as Schism and Reinlie were often recognized.
 
 See, e.g.,
 
 146 Cong. Rec. H3322 (daily ed. May 18, 2000) (statement of Rep. Frost) (“[Rep. Shows] has introduced legislation that would fulfill a promise that has been made to every member of the armed services: Stay in 20 years and they will receive healthcare for the rest of them life.”); 146 Cong. Rec. S4621 (daily ed. June 7, 2000) (statement of Sen. Johnson) (“We all know the history: For decades, men and women who joined the military were promised lifetime health care coverage for themselves and their families. They were told, in effect, if you disrupt your family, if you work for low pay, if you endanger your life and limb, we will in turn guarantee lifetime health benefits. Testimony from military recruiters themselves, along with copies of recruitment literature dating back to World War II, show that health care was promised to active duty personnel and their families upon the personnel’s retirement.”); 146 Cong. Rec. S10336 (daily ed. Oct. 12, 2000) (statement of Sen. Warner) (“I am pleased to announce that the conference report to accompany the National Defense Authorization Act for Fiscal Year 2001 includes a permanent health care benefit for retirees-modeled on the Senate bill. I am delighted that we have honored the commitment of health care for life that was made to those who proudly served this nation. This is long overdue.”). We agree that the government made an unambiguous offer of free, lifetime health care, and that the retirees accepted that offer by their performance of career military service.
 
 See
 
 Restatement (Second) of Contracts § 45(1) (1981).
 

 (4)
 
 Authority to Bind the Government
 

 The government argues that any promise of free, lifetime health care is unenforceable for lack of express authority from Congress. In support, it cites
 
 Federal Crop Ins. Corp. v. Merrill,
 
 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).
 
 Merrill
 
 stands for the proposition that one who deals with a government agent bears the burden of determining that the agent is authorized to bind the government.
 
 See
 
 332 U.S. at 384, 68 S.Ct. 1. But this principle does not inform our decision, because there is nothing in the record suggesting that the recruiters who made these promises were not authorized to do so. There is nothing in the regulations or law prior to 1956 that would have prohibited recruiters from making these promises; indeed those regulations appear to authorize them. At the least, there is no inconsistency between them. The recruiting letter from the Secretary of the Navy is evidence that the leadership of the military departments endorsed and officially echoed those promises.
 

 Merrill
 
 recognizes that legal authority may be delegated to agencies. The statute under which the military departments regulated military health care, 5 U.S.C. § 301, delegated broad legal authority to the secretaries to govern their respective military departments. Before 1956, promises of free, lifetime health care were well within the discretion and power of the secretaries. Funding by Congress of the military’s health care system confirmed this broad delegation. Congressional delegation of authority along with the absence of any contrary statutes or regulations in force at the time the retirees entered military service, gives the promises of free, lifetime health care made by recruiters, under the authority of the secretaries, the force of law and creates an implied-in-fact contract binding upon the government.
 

 In
 
 Lynch v. United States,
 
 the Supreme Court examined Congress’ ability to avoid paying out benefits promised under a contract and contrasted it with congressional power over gratuities which can “be redistributed or withdrawn at any time in the discretion of Congress.” 292 U.S. 571,
 
 *1289
 
 577, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). Gratuities “involve no agreement of the parties; and the grant of them creates no vested right.”
 
 Id.
 
 The plaintiffs in
 
 Lynch
 
 entered into agreements with the United States for War Risk Insurance and had paid the prescribed monthly premiums.
 
 Id.
 
 Congress delegated power to the Veterans Administration to prescribe the form of policies, and the form provided that the policies were subject to amendment and regulations then in force and thereafter adopted. Congress subsequently enacted the Economy Act which included a clause stating: “... all laws granting or pertaining to yearly renewable term insurance are hereby repealed....”
 
 Id.
 
 at 575, 54 S.Ct. 840. Nevertheless, the Supreme Court held that Congress had no power to curtail the amount of the benefits which the government had contracted to pay, stating that “[n]o doubt there was in March, 1933, great need of economy.... But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States.”
 
 Id.
 
 at 580, 54 S.Ct. 840. Congress has no power to curtail benefits for which the government has previously contracted to provide.
 

 This court has addressed a claim to free, lifetime health care brought by military retirees on another occasion. In
 
 Sebastain
 

 [2]
 

 v. United States,
 
 185 F.3d 1368 (Fed.Cir.1999), retired career members of the military services, surviving spouses of deceased members, and an association of such persons alleged that the deprivation of these benefits was illegal. The sole ground upon which they sought damages was that the government’s conduct constituted a taking of their property “ ‘right’ to free medical care after retirement....”
 
 Id.
 
 at 1370. The court examined the governing statutes and regulations “to ascertain whether the Retirees have an unconditional right to lifetime
 
 free
 
 medical care,”
 
 id
 
 at 1371, and concluded that “[njothing in these regulations provided for unconditional lifetime free medical care or authorized recruiters to promise such care as an inducement to joining or continuing in the armed forces,”
 
 id.
 
 at 1372. While the statute itself in
 
 Larionoff
 
 authorized the service to provide the bonus, the statutes and the regulations at issue did not explicitly authorize the military to promise retirees free, lifetime medical care.
 

 The
 
 Sebastain
 
 retirees made no claim of implied-in-fact contract, nor did they provide evidence, as in the record here, to support such a claim. To prevail on a taking claim under the Fifth Amendment of the Constitution (the sole theory in
 
 Se-bastain),
 
 there must first be a protected property interest; thus, the court’s analysis must be read in terms of determining whether the governing statutes and regulations, in and of themselves, establish a protected property interest. That is not the issue here. 5 U.S.C. § 301 and the military regulations may not establish a protected property right under the Fifth Amendment, but they are evidence of the broad authority the military secretaries had to manage their departments, including creating packages of incentives to recruit and retain personnel for hazardous military duties, and to bind the government to contracts in furtherance of their statutory function to recruit service members.
 
 See, e.g.,
 
 10 U.S.C. §§ 3013, 5013, 8013 (1994) (The secretaries have “the authority necessary to conduct, all affairs of the Department[s] ..., including the following functions: (1) Recruiting....”).
 

 We see no meaningful difference between the situation in
 
 Larionoff,
 
 where the statute explicitly authorized the reenlistment bonus, and the present situation, where 5 U.S.C. § 301 delegates broad au
 
 *1290
 
 thority to the secretaries to recruit service members; and the secretaries, through them agents the recruiters, promised free, lifetime health care to those who met certain service obligations. Prior to the enactment of 10 U.S.C. § 1074(b) in 1956, the secretaries had such authority and nothing-in the law or regulations precluded them from contracting to provide these benefits in exchange for twenty years of service. Though the authority from Congress was delegated rather than direct, the implied-in-fact contract to provide free, lifetime health care between Reinlie and Schism and the government is no less binding on the government than the promise to pay a reenlistment bonus in
 
 Larionoff
 
 whose amount was based on a formula set well before the time at which it was to be paid.
 

 When the government forced the retirees to rely on Medicare, it breached the implied-in-fact contract. In
 
 Winstar Corp. v. United States,
 
 64 F.3d 1531, 1546 (Fed.Cir.1995), we held that the terms of a government contract, like any other contract, do not change with the enactment of subsequent legislation, absent a specific contractual provision providing for such a change. This was confirmed by the Supreme Court.
 
 See United States v. Winstar,
 
 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In
 
 Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
 
 530 U.S. 604, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), the Supreme Court held that legislation could itself be the “statement by the obligor to the obligee indicating that the obligor will commit a breach.”
 
 Id.
 
 at 2435. The fact that the Secretaries’ repudiation of the contract to provide free, lifetime health care “rested on the enactment of a new statute makes no significant difference.”
 
 Id.
 

 In
 
 Winstar,
 
 the Federal Home Loan Bank Board, a federal agency acting under delegated Congressional authority, entered into agreements with several thrifts “to accord them particular regulatory treatment in exchange for their assumption of liabilities that threatened to produce claims against the Government as insurer.”
 
 Winstar,
 
 518 U.S. at 843, 116 S.Ct. 2432. Despite the highly regulated nature of the savings and loan industry and the likelihood of changes to the regulatory structure during the pendency of the agreements, the Supreme Court applied the ordinary principles of contract construction and breach that would be applicable to any contract action between private parties and held the agreements to be enforceable.
 
 Id.
 
 at 870, 116 S.Ct. 2432. Although the board could not prevent Congress from changing the applicable regulations, the agreements were valid promises to insure the thrifts against loss arising from future regulatory changes.
 
 Id.
 
 at 869-70, 116 S.Ct. 2432;
 
 Amino Bros. Co. v. United States,
 
 178 Ct.Cl. 515, 372 F.2d 485, 491 (Ct.Cl.1967) (“The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government’s sovereign act.”), quoted in
 
 Winstar,
 
 518 U.S. at 881-82, 116 S.Ct. 2432;
 
 Hughes Communications Galaxy, Inc. v. United States,
 
 998 F.2d 953, 959 (Fed.Cir.1993) (Government “contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future. That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding.... ”);
 
 New Valley Corp. v. United States,
 
 119 F.3d 1576, 1582 (Fed.Cir.1997) (“[R]egardless of the sovereign acts doctrine, the contracts shifted responsibility to the government for changes in its launch priority and scheduling policy.”). The Supreme Court made clear that “the National Government has some capacity to make agreements
 
 *1291
 
 binding future Congresses by creating vested rights,” and found that the promised regulatory treatment was within that capacity.
 
 Winstar,
 
 518 U.S. at 876, 116 S.Ct. 2432.
 

 Here, the secretaries, acting under congressional authority delegated by 5 U.S.C. § 301, made implied-in-fact contracts to provide Schism and Reinlie and their dependents with free, lifetime health care provided they served for twenty years. This created a contractual right to that medical care that the passage of 10 U.S.C. §§ 1074(b) and 1076(b) could not divest. The notion that the federal government could avoid a contractual obligation through subsequent legislation would conflict with the government’s “own long-run interest as a reliable contracting partner in the myriad of workaday transactions of its agencies.”
 
 Winstar,
 
 518 U.S. at 883, 116 S.Ct. 2432. The government has the power to enter into contracts which confer rights and has the duty to honor them.
 
 Id.
 
 at 885 n. 28, 116 S.Ct. 2432 (citations omitted). “To say that the Congress may withdraw or ignore [the government’s] pledge, is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government.”
 
 Perry v. United States,
 
 294 U.S. 330, 351, 55 S.Ct. 432, 79 L.Ed. 912 (1935). “Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation.”
 
 Lynch,
 
 292 U.S. at 580, 54 S.Ct. 840.
 

 The retirees entered active duty in the armed forces and completed at least twenty years service on the good faith belief that the government would fulfill its promises. The terms of the contract were set when the retirees entered the service and fulfilled their obligation. The government cannot unilaterally amend the contract terms now. “In contracts involving the government, as with all contractual relationships, rights vest and contract terms become binding when, after arms length negotiation, all parties to the contract agree to exchange real obligations for real benefits.”
 
 Winstar,
 
 64 F.3d at 1546. Because failure to perform a contractual duty when it is due is a breach,
 
 see
 
 Restatement (Second) of Contracts § 235(2) (1981), the government breached its implied-in-fact contract with the retirees when it failed to provide them with health care benefits at no cost.
 
 [3]
 
 The district court therefore erred in granting summary judgment to the government and, on the record before us, abused its discretion in denying the retiree’s motion for summary judgment of liability.
 

 Conclusion
 

 Accordingly, the judgment of the United States District Court for the Northern District of Florida is reversed and the case is remanded for determination of damages.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . The National Security Act Amendments of 1949, Pub.L. No. 81-216, § 4, 63 Stat. 578, created the Department of Defense and redes-ignated the Departments of the Army, Navy, and Air Force, which had been executive departments, as military departments.
 

 [2]
 

 . Lead appellant’s name is misspelled; it should be Sebastian. However, while we will use the name as printed in the Federal Reporter, it should be noted that the case name is
 
 Sebastain v. United States
 
 in the prior and subsequent history.
 

 [3]
 

 . In light of
 
 Sebastain,
 
 we decline to address the retirees’ claim under the Fifth Amend-m'ent of the Constitution.