Richard D. THOMPSON, et al., Plaintiffs,

v.

COMMUNITY INSURANCE CO., Defendant.

No. C–3–98–323.

United States District Court, S.D. Ohio, Western Division.

Oct. 7, 2002.

Richard Stuart Wayne, William, Kendall, Flynn, Strauss & Troy, Cincinnati, OH, Ronald Patrick Keller, Cox & Chappars, Xenia, OH, Steven F. Stuhlbarg, Strauss & Troy, Cincinnati, OH, Charles M. Rowland, II, Cox & Keller, Xenia, OH, for plaintiff.

Robert P. Johnson, Thompson Hine, LLP, Earle Jay Maiman, Thompson, Hine & Flory, Cincinnati, OH, for defendant.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION (DOC. # 34); DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 37) SUSTAINED IN PART AND OVERRULED IN PART; PLAINTIFFS' MOTIONS TO STRIKE (DOC. # 44–1) OR, IN THE ALTERNATIVE, TO FILE SUPPLEMENTAL MEMORANDUM (DOC. # 44–2) ARE OVERRULED; CONFERENCE CALL SET TO ESTABLISH TRIAL DATE AND OTHER DATES

RICE, Chief Judge.

This litigation stems from an announcement by Community Insurance Company,

dba Anthem Blue Cross and Blue Shield ("Anthem"), that it would be discontinuing its Anthem Senior Advantage Plan ("ASA Plan") in twenty-two Ohio counties. The ASA Plan provides medical coverage for routine office visits, check-ups, and hospitalization, including in-patient and out-patient services (2d A.Compl.¶ 3). Participants enroll in the ASA Plan in lieu of traditional Medicare; it is not a supplement to Medicare (*id.*). In addition, the Plan is not an insurance policy that merely pays the deductible and co-insurance charges for eligible individuals (*id.* ¶ 6). Rather, Anthem has entered into a contract with the Health Care Finance Administration ("HCFA"), the agency of the federal government which administers Medicare and Medicaid, pursuant to which HCFA makes a monthly payment to Anthem for each Medicare beneficiary who enrolls in the ASA Plan (*id.*). The contract between Anthem and HCFA is renewed on an annual basis (*id.* ¶ 8).

On May 23, 1998, Anthem distributed correspondence to approximately 20,000 senior citizens in twenty-two Ohio counties, advising them that, as of December 31, 1998, it would no longer provide the ASA Plan to enrolled participants in those localities (*id.* ¶ 14). In six of the affected counties, participants had no alternative Medicare HMO option (*id.* ¶ 15). In October of 1998, in response to this litigation and other criticism, Anthem announced that it would continue offering coverage in these six counties, along with three additional counties, but with reduced benefits and increased premiums (*id.* ¶ 16).[1]

This litigation is brought by two individuals, Richard D. Thompson ("Thompson") and James E. Criner ("Criner"). Mr. Thompson has participated in the ASA Plan since June of 1997 (*id.* ¶ 1). As a resident of Greene County, he is currently paying increased premiums for reduced coverage (*id.* ¶ 17). Mr. Criner enrolled in the ASA Plan in August of 1997, and participated until Anthem terminated the program for Clark County residents on December 31, 1998 (*id.* ¶ 2). Upon termination of the ASA Plan in Clarke County, Mr. Criner had to seek alternative health care coverage; due to pre-existing conditions, he was forced to rely on traditional Medicare for his health insurance needs (*id.* ¶ 18). Both individuals had enrolled in the ASA Plan by entering into the standard form Senior Advantage contract for Ohio residents (the "Ohio Certificate")(*id.* ¶ 5).[2]

On June 30, 1998, in response to Anthem's actions, Plaintiffs initiated this litigation in the Greene County Court of Common Pleas (Doc. # 1). The lawsuit was removed to this Court on July 30, 1998, asserting that the Court has federal question subject matter jurisdiction (*id.*).[3] In their First Amended Complaint (Doc. # 16), they set forth nine causes of action, to wit: (1) a state law claim of breach of contract; (2) a request for specific performance; (3) a state law claim of promissory estoppel; (4) a state law claim of breach of fiduciary duty; (5) a state law claim of bad faith termination of the ASA Plan; (6) a state law claim of fraud; (7) a request for punitive damages, pursuant to Ohio Revised Code § 2315.21; (8) a request for declaratory judgment, pursuant to Ohio Revised Code Ch. 2721; and (9) a request for injunctive relief. On November 27, 1998, they moved for an order certifying this litigation as a class action (Doc. # 15). Plaintiffs' Motion for Class Certification was overruled on September 27, 1999 (Doc. # 25), and their Motion for Reconsideration was overruled on September 8, 2000 (Doc. # 32). The Court granted Plaintiffs leave to file a Second Amended Complaint and a renewed Motion to Certify the Class (*id.*). On September 28, 2000, Plaintiffs filed a Second Amended Complaint (Doc. # 33), which attempted to address the Court's concerns regarding class

---

1. The ASA Plan was reauthorized for Brown, Darke, Greene, Miami, Preble, Shelby, Warren, Madison, and Columbiana Counties.

2. Plaintiffs attach a copy of the Ohio Certificate as Exhibit A to their Second Amended Complaint. Hereinafter, the Court will cite to that document as "Ohio Cert., p. __".

3. On March 3, 1999, the Court overruled Plaintiffs' Motion for Remand, on the ground that Anthem had properly removed under 28 U.S.C. § 1442(a)(1) (Doc. # 23).

certification.[4] They subsequently filed a Renewed Motion for Class Certification (Doc. # 34).

Pending before the Court are Plaintiffs' Motion for Class Certification (Doc. # 34), Plaintiffs' Motion to Strike Supplemental Authority in Opposition to Plaintiff's Renewed Motion for Class Certification (Doc. # 44–1), their Motion to file Supplemental Memorandum (Doc. # 44–2), and Defendant's Motion for Summary Judgment (Doc. # 37). As a means of analysis, the Court will begin with Plaintiffs' Motion to Strike, followed by their Motion for Class Certification. The Court will then turn to Defendant's Motion for Summary Judgment. For the reasons assigned, Plaintiffs' Motion to Strike (Doc. # 44–1) and their Motion to File Supplemental Memorandum (Doc. # 44–2) are OVERRULED. Plaintiffs' Motion for Class Certification (Doc. # 34) is OVERRULED in Part and SUSTAINED in PART. Defendant's Motion for Summary Judgment (Doc. # 37) is OVERRULED in PART and SUSTAINED in PART.

I. *Plaintiffs' Motion to Strike (Doc. # 44–1) and to File Supplemental Memorandum (Doc. # 44–2)*

On February 22, 2001, Anthem filed a Notice of Supplemental Authority in Opposition to Plaintiffs' Renewed Motion for Class Certification (Doc. # 43). In that memorandum, Defendant refers the Court to *Schism v. United States,* 239 F.3d 1280 (Fed.Cir.2001). Plaintiffs assert that Anthem's filing is more than a notice of supplemental authority but, instead, constitutes a supplemental memorandum. They request that the Court strike Defendant's Memorandum, on the ground that Anthem failed to seek leave of Court to file a sur-reply memorandum. Plaintiffs further request leave to file a supplemental memorandum, addressing this sur-reply memorandum, should the Court elect not to strike Defendant's memorandum.

The Court observes that the *Schism* decision noted by Defendant has been withdrawn and the judgment was vacated. *Schism v.*

*United States,* 252 F.3d 1354 (Fed.Cir.2001) (granting motion for rehearing *en banc*).[5] Thus, the decision cited to the Court by Defendant has no precedential value and will not be considered. Accordingly, although the Court will not consider the *Schism* decision cited by Anthem, the Court sees no reason to strike its memorandum. Likewise, the Court sees no benefit in allowing Plaintiffs to respond to that memorandum. Accordingly, both Plaintiffs' Motion to Strike (Doc. # 44–1) and their Motion, in the alternative, to File a Supplemental Memorandum (Doc. # 44–2) are OVERRULED.

II. *Plaintiffs' Renewed Motion for Class Certification (Doc. # 34)*

In their Second Amended Complaint, Plaintiffs again allege that this action is properly maintained as a class action. They allege that the class consists of:

> all persons in the State of Ohio who were enrolled in the Anthem Senior Advantage program on or about May 23, 1998, who were informed on or about that date by Anthem that Anthem intended to withdraw coverage under this program as of December 31, 1998, and who have not subsequently enrolled in an alternative HMO Medicare Plan offered by a private insurance company other than Anthem.

(2d A.Compl.¶ 21). Plaintiffs propose two subclasses, to wit: (1) class members residing in Brown, Darke, Greene, Miami, Preble, Shelby, Warren, Madison, and Columbiana Counties who elected to continue coverage under the revised ASA Plan ("Thompson's class"); and (2) class members residing in Carroll, Clark, Clinton, Coshocton, Delaware, Fairfield, Highland, Holmes, Licking, Pickaway, Stark, Tuscawaras, and Wayne Counties who, due to Anthem's withdrawal of coverage, have turned to traditional Medicare. Plaintiffs now ask the Court to certify this class and the specified subclasses ("Criner's class").

▮ A district court may not certify any class without "rigorous analysis" of the re-

---

4. The causes of action asserted in Plaintiffs' Second Amended Complaint are identical to those asserted in their First Amended Complaint.

5. To date, no *en banc* decision has been rendered.

quirements of Rule 23. *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.), *cert. denied,* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998); *Cross v. National Trust Life Ins. Co.,* 553 F.2d 1026, 1029 (6th Cir. 1977)(The court has broad discretion in certifying class actions, but must exercise that discretion within the framework of Rule 23). In evaluating whether to certify a class, the Court must not consider the merits of the action. *In re Cincinnati Radiation Litigation,* 187 F.R.D. 549 (S.D.Ohio May 13, 1999); *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The district court must take the allegations of plaintiffs as true and any doubts as to certification should be resolved in favor of plaintiffs. *Id.* However,

> [m]ere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled. Maintainability may be determined by the court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide.... The parties should be afforded an opportunity to present evidence on the maintainability of the class action.

*In re American Med. Sys.,* 75 F.3d at 1079 (quoting *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir.1974)).

The Federal Rules of Civil Procedure mandate a two step process to determine if an action is maintainable as a class action. *First,* the Court must determine whether the four prerequisites to a class action are present. These four prerequisites, referred to as numerosity, commonality, typicality, and adequacy of representation, are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the

class. Fed.R.Civ.P. 23(a). These prerequisites limit class claims to those which are encompassed by the named plaintiffs' claims. *Falcon,* 457 U.S. at 147, 102 S.Ct. 2364. No class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified. *Sprague,* 133 F.3d at 397.

*Second,* if the foregoing are satisfied, the Court must then determine whether one of the factual situations described in Rule 23(b) has been established. *E.g., In re American Med. Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). Specifically, the Court must decide whether: (1) separate actions would create inconsistent results or would be dispositive of the interests of other potential plaintiffs; (2) the party opposing the class has acted, or refused to act, on grounds generally applicable to the class; or (3) issues common to the class predominate over other issues, such that the best method of trying the suit is as a class action.[6] Where subclasses are proposed, each subclass must comply with each of the foregoing requirements. *Weathers v. Peters Realty Corp.,* 499 F.2d 1197 (6th Cir.1974).

In its memorandum in opposition to class certification (Doc. # 19), Anthem alleges that Plaintiffs have not satisfied any of the requirements of Rule 23(a). In addition, it contends that Plaintiffs' claims of estoppel, breach of fiduciary duty, and fraud are not suitable for resolution as a class action. Defendant also asserts that Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3).

### A. Numerosity

"To satisfy Rule 23(a)(1), the proponents of class certification must establish that 'the class is so numerous that joinder of all members is impracticable.' The numerosity requirement does not impose an absolute numerical limitation. Rather the Court must examine the facts of the case and determine whether Plaintiffs will suffer distinct litigational hardship or inconvenience if joinder is required." *In re Cincinnati Radiation Litigation,* 187 F.R.D. at 552 (eighty class mem-

---

6. Plaintiffs' Complaint alleges that class certification is proper under Rule 23(b)(3).

**292**

bers sufficient to satisfy numerosity requirement).

▮▮ In their Complaint, Plaintiffs allege that "it is believed that the Class consists of approximately 20,000 individuals located in 22 counties in the State of Ohio." (2d A.Compl.¶ 23). Anthem asserts that the second proposed subclass fails to meet the numerosity requirement, arguing that, aside from Criner, Plaintiffs have not identified any ASA Plan subscriber who returned to traditional Medicare instead of joining another Medicare HMO. In response, Plaintiffs provide evidence that subclass # 1 (Thompson's subclass) consists of approximately 7,000 individuals (Flynn Decl. at Ex. C). Plaintiffs acknowledge that of the approximately 13,000 individuals whose coverage was terminated, some turned to other Medicare HMOs. However, they argue that even one percent (130) of those individuals would be sufficient to satisfy the numerosity requirement. The Court agrees with Plaintiffs that it is likely that the class is sufficiently large to satisfy the numerosity requirement. Moreover, in order to join each member of the class individually, Plaintiffs would be forced to determine which of the 13,000 individuals decided to turn to another Medicare HMO, rather than to traditional Medicare—a daunting, if not impossible, task. Accordingly, the Court concludes that the numerosity requirement has been satisfied.

### B. *Commonality*

▮▮ The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, the Sixth Circuit has stated that there need only be one question common to the class. *American Med. Sys.*, 75 F.3d at 1080. The common issue must be one the resolution of which will advance the litigation. The commonality requirement is satisfied "as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." *In re Cincinnati Radiation Litig.*, 187 F.R.D. at 552–53 (quoting *Day v. NLO, Inc.*, 144 F.R.D. 330, 333 (S.D.Ohio 1992), *vacated on other grounds*, 5 F.3d 154 (6th Cir.1993)).

▮▮ In their renewed Motion, Plaintiffs note that the Court has previously stated that they satisfied the commonality requirement, at least for the breach of contract, breach of fiduciary duty, and bad faith claims. They do not assert that their other causes of action meet this requirement. As stated in its prior Decision (Doc. # 25), taking Plaintiffs' substantive allegations as true, common issues exist among the proposed class members with respect to Plaintiffs' claims for breach of contract, breach of fiduciary duty, and bad faith. The interpretation of the ASA Plan is a question common to all members of the class, and the resolution of that issue is necessary to further the litigation on those claims. In addition, these claims contain no elements which typically require individualized analysis, such as intent or reliance. Accordingly, Plaintiffs may pursue class certification with respect to these claims, assuming the other Rule 23 prerequisites are met. *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D.Ga. 1983)("[C]laims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such."). Likewise, for the reasons set forth in this Court's Decision on Plaintiffs' original Motion for Class Certification (Doc. # 25), litigation as a class action of their promissory estoppel and fraud claims, which, as discussed *infra*, are dismissed herein, would not be appropriate.

### C. *Typicality*

▮▮ The typicality requirement "limit[s] the class claims to those fairly encompassed by the named plaintiffs' claims." *American Med. Sys.*, 75 F.3d at 1082 (citation and quotation omitted).

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.... A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the

named plaintiff will also advance the interests of the class members. *Id., citing* 1 Herbert B. Newberg and Alba Conte, 1 Newberg on Class Actions, § 3–13, at 3–75, 76 (3d ed.1992)(internal quotations omitted). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399.

Plaintiffs contend that they have met the typicality requirement, in that the claims of Thompson and Criner, the two class representatives, are not antagonistic to the class and, to the contrary, are exactly the same as the claims of their respective subclass members. With regard to Mr. Thompson, they argue that he is typical of those who reside with the nine reauthorized counties and who have decided to continue with the ASA Plan, albeit with increased costs and decreased benefit levels. Defendant argues that Thompson is not typical, because the members of the subclass do not receive uniform coverage and do not pay a uniform premium. Anthem states that four different plans are spread between the nine counties included in the first subclass. Thus, individuals within the proposed subclass faced different financial and health care consequences, depending on the county and region of residence in which they lived. In essence, Anthem argues that not all members of subclass # 1 faced increased costs and decreased benefits. Thus, Thompson would not be a typical representative.

Reviewing the facts as to Mr. Thompson, he resides in Greene County, Ohio, where Anthem has decided not to terminate the ASA Plan. Although the plan has been reinstated, Mr. Thompson must pay an increased monthly premium and increased co-payments, and he will receive reduced benefits (Thompson Dep. Ex. 12). Despite these additional charges, Mr. Thompson has chosen to remain with the ASA Plan (*id.* at 68). Because Anthem has decided to reinstate the ASA Plan in his county, and because he has chosen to continue with Anthem's Medicare HMO plan, albeit with increased costs and reduced benefits, Mr. Thompson is typical of

a member of subclass # 1 who seeks to participate with the ASA Plan under its original terms.[7] The fact that Mr. Thompson's terms may have changed in a different manner than other members of his subclass, *i.e.,* his premium and benefits have been altered to a different extent, goes to differences in the degree of their injuries (damages), not the kind of their injuries.

As for Mr. Criner, Plaintiffs state that he is typical of plan participants in the counties in which the ASA Plan has been completely eliminated and where the participants have turned to traditional Medicare. Defendant argues that Criner cannot be a typical representative, because individuals within the counties where the ASA Plan was eliminated had varying choices as to what plan to participate in following termination of the contract. Anthem emphasizes that Criner neither explored nor chose from the alternative Medicare HMOs. Moreover, it suggests that Criner may not be typical, because he returned to Medicare without purchasing a Medicare supplement policy.

Similar to Mr. Thompson, Mr. Criner now constitutes a typical member of his subclass. Mr. Criner is a resident of Clarke County, Ohio, where the ASA Plan has been terminated. Alternative Medicare HMOs are available in Clarke County. In his deposition, Mr. Criner testified that neither of those alternative HMOs would accept pre-existing conditions for at least two years, a policy which would affect his wife, and neither of these alternatives would cover the physicians that he uses (Criner Dep. at 52–58). He stated that he anticipated that he would return to traditional Medicare after January 1, 1999 (*id.* at 63). As stated in its prior Decision on class certification, with these facts, Mr. Criner might generally be representative of the plan participants whose coverage was being terminated. As an individual who turned to traditional Medicare, he is certainly typical of the subclass of individuals whose ASA Plan was terminated and who selected Medicare instead of participating with an alternative Medicare HMO. The fact that Mr. Criner may have had more or fewer

7. The Court notes that proposed subclass # 1 does not include individuals who elected to di-senroll from the ASA Plan in the reinstated counties, for whatever reason.

choices of alternative Medicare HMOs, following the elimination of the ASA Plan, does not alter the fact that those in his subclass ended up with traditional Medicare instead of continuing with the ASA Plan. Accordingly, Plaintiffs have satisfied the typicality requirement for each of their proposed subclasses.

### D. *Adequacy of Representation*

 The adequacy-of-representation requirement addresses concerns about the competency of class counsel and conflicts of interest. *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir.1998), *citing Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364; Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.22, at 3–126 (3d ed. 1992)("[T]he two factors that are now predominately recognized as the basic guidelines for the Rule 23(a)(4) prerequisite are[:] (1) absence of conflict and (2) assurance of vigorous prosecution."). The adequacy requirement is met where the representatives: (1) have common interests with the unnamed class members; and (2) will vigorously prosecute the class action through qualified counsel. *Senter v. General Motors Corp.,* 532 F.2d 511, 525 (6th Cir.1976); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between the named parties and the class they seek to represent.").

Plaintiffs state that they are represented by counsel with substantial experience in the prosecution of class actions and that the named Plaintiffs have no interests antagonistic to the class. Thus, Plaintiffs argue, they can adequately represent the class. Anthem responds that Plaintiffs cannot adequately represent the class, because they have admitted, in their depositions, that the claim for breach of contract lacks merit. Anthem further argues that Plaintiffs prosecution of this lawsuit indicates a lack of adequacy of representation in that they have not sought a preliminary injunction.

Again, although the Court has not been provided evidence regarding this issue, it sees no reason why these excellent counsel cannot adequately represent Plaintiffs. In addition, the Court should not consider the merits of Plaintiffs' claims in determining whether to certify a class. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Thus, as a general matter, it is irrelevant that Defendant can produce evidence that Plaintiffs' breach of contract claim lacks merit. As for Defendant's assertion that Mr. Criner and Mr. Thompson have admitted that their claims have no merit, Plaintiffs' deposition testimony does *not* constitute such an admission. Upon review of Mr. Criner's deposition, he clearly expresses his belief that the Ohio Certificate does not authorize Anthem's termination of his contract. Thus, he has not admitted that his breach of contract claim lacks merit. As to Mr. Thompson, the portion of his deposition testimony to which Defendant cites states, in pertinent part:

Q. . . . Were you aware that the plan could change services, rates or other terms of the certificate as it's referred to here in this contract?

A. No.

Q. If you had read that, would you have understood?

A. Well, I can understand, but I didn't read it.

(Thompson Depo. at 56). Although this testimony may constitute evidence that Mr. Thompson understood the provision of the Ohio Certificate concerning amendment of the terms of the contract, it is not a statement that he believes his claims have no merit. Thus, neither Plaintiff has explicitly acknowledged that his respective breach of contract claim lacks merit.

Turning to the named Plaintiffs, the Court sees no reason why Plaintiffs cannot adequately represent their respective subclasses. With regard to Mr. Thompson, Anthem has reversed its decision to terminate its coverage in Greene County, and he has decided to continue with the ASA Plan. Although Anthem provides evidence that Thompson's personal cost is the same as the alternative he left to join the ASA Plan and that his current coverage is better, Thompson's cost and coverage are not identical to the coverage he had before Anthem reinstated the Plan in his

county. Thus, for purposes of Anthem's liability, he could adequately represent those who have suffered similar, if not identical, adverse changes.

As to Mr. Criner, Anthem has terminated coverage in the County in which he lives. As with other members of his proposed subclass, he has chosen to rely on traditional Medicare, rather than elect an alternative Medicare HMO. That his reasons for choosing traditional Medicare may vary from others in his subclass has little significance as to whether he can adequately represent the class for claims based on wrongfully terminating the contract.

Defendant has repeatedly argued that Mr. Criner is not an adequate representative, because he may be eligible to receive medical benefits through the Veterans Administration, thus excluding him from the proposed subclass. As of this date, Defendant has provided no evidence that Criner is entitled to medical benefits from the government, due to his past military service. At present, he remains a member of his subclass. Thus, at this time, the Court finds no basis to conclude that Mr. Criner is not an adequate representative for his subclass. Accordingly, the Court concludes that Plaintiffs have demonstrated that the named Plaintiffs are adequate representatives of the class.

### E. *Rule 23(b)(3)*

"Pursuant to Rule 23(b)(3), a class action may be maintained if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and just adjudication of the controversy." *Eddleman v. Jefferson County, Ky.,* 1996 WL 495013 (6th Cir. Aug.29, 1996). Anthem argues that Plaintiffs cannot demonstrate that the questions of law or fact common to all subclass members predominate over questions affecting only the individual members. As to Criner's subclass, they argue: "The Court cannot adjudicate those claims without hearing from each individual member why they chose to return to traditional Medicare; how, if at all, they may have been injured by

that decision, and whether they failed to mitigate their damages by not enrolling in another Medicare HMO." (Doc. # 38 at 19). They contend that the decision facing each member of the proposed subclass involving these nine counties depended upon at least three factors: price, coverage, and availability of alternatives. With regard to Thompson's subclass, Defendant has previously asserted that the changes in premiums and benefit levels varied by county, as well.

The Court agrees with Defendant that it would be nearly impossible to litigate *damages* as a class action. Each class members' damages would vary, depending on the options available to him or her upon termination of coverage under the ASA Plan, or on the various changes to premium and benefit levels in the reinstated counties. However, "[v]arying damage levels rarely prohibit a class action if the class members' claims possess factual and legal commonality." *Eddleman, supra,* citing *Mayer v. Mylod,* 988 F.2d 635, 640 (6th Cir.1993) (in securities fraud action, commonality and typicality requirements met even where some investors made money and some lost money because questions of liability are common to all class members regardless of their level of damages) and *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988) (in mass toxic tort action, even though damages may be disparate, where liability can be determined on a class-wide basis because it arises from a single course of conduct that is identical for each plaintiff, class action suitable for adjudication). Moreover, the Court may elect to certify the class for purposes of liability and not for damages. Such an action appears appropriate herein. Accordingly, the Court finds Defendant's argument unavailing, and concludes that questions of law or fact common to the class members, with regard to Anthem's liability, predominate over the individual claims. However, the issue of damages, should this litigation reach this issue, will require specialized treatment.

In summary, the Court concludes that Plaintiffs have satisfied the requirements for class certification with regard to Anthem's liability for Plaintiffs' breach of contract, bad faith, and breach of fiduciary

duty claims. In that respect only, Plaintiffs' Motion for Class Certification (Doc. # 34) is SUSTAINED. The Court certifies that sub-classes proposed by Plaintiffs, to wit: (1) class members residing in Brown, Darke, Greene, Miami, Preble, Shelby, Warren, Madison, and Columbiana Counties who elected to continue coverage under the revised ASA Plan; and (2) class members residing in Carroll, Clark, Clinton, Coshocton, Delaware, Fairfield, Highland, Holmes, Licking, Pickaway, Stark, Tuscawaras, and Wayne Counties who, due to Anthem's withdrawal of coverage, have turned to traditional Medicare. Plaintiffs' Motion for Class Certification, as it relates to their other state law claims and attendant damages, is OVERRULED.[8]

## III. *Defendant's Motion for Summary Judgment (Doc. # 37)*

Defendant seeks summary judgment on each of Plaintiffs' claims. As a means of analysis, the Court will first set forth the standard governing Anthem's motion, and then address each of Plaintiffs' claims in turn.[9]

### A. *Standard Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it

believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence

---

8. As stated in this Court's previous Decision, claims of fraud and promissory estoppel are generally inappropriate for class treatment, because of the need to provide individualized evidence of reliance. Likewise, the amount of damages that each class member may have suffered depends on the county in which he or she resided and the subsequent coverage that he or she obtained.

9. As an initial matter, the Court notes that the Ohio Certificate specifies that the policy is "made and shall be interpreted under the laws of the State of Ohio." (Ohio Cert. p. 33) The parties appear to agree that Ohio law governs this litigation.

must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the rec-

ord in search of evidence to support a party's opposition to summary judgment....") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

**B. *Breach of Contract (Count One)***

■■■■ Anthem asserts that it is entitled to summary judgment on Plaintiffs' breach of contract claim, because it was entitled to amend or terminate their coverage, pursuant to the terms of the contract.[10] The basic principles of contract interpretation are well-established:

> Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement ... Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions ... When the terms in a contract are unambiguous, courts will not[,] in effect[,] create a new contract by finding an intent not expressed in the clear language employed by the parties.

*Shifrin v. Forest City Enters., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499, 501 (1992) (citations omitted). Thus, if a contract is clear and unambiguous, its interpretation is a matter of law and no issues of fact exist. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146, 150 (1978). Courts must give the contract reasonable construction in conformity with the parties' intent, as expressed by the words of the contract. *Dealers Dairy Products Co. v. Royal Ins. Co.*, 170 Ohio St. 336, 164 N.E.2d 745 (1960). A contract is ambiguous if it is susceptible to more than one reasonable in-

---

**10.** Thompson's claim for breach of contract is based on Anthem's decision to continue coverage in his County, albeit with an increased premium and decreased benefits. Criner's coverage has

been discontinued. Thus, his breach of contract claim is based on the termination of the ASA Plan.

terpretation. *American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66 (S.D.Ohio.1980)(Hogan, J.); *City of Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 52 Ohio St.3d 174, 177, 556 N.E.2d 1186 (1990). "In making the determination of whether language is ambiguous, courts must generally give words and phrases their plain, ordinary, natural or commonly accepted meaning." *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 167–168, 436 N.E.2d 1347 (1982). Ohio follows the rule that "[w]here provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380 (1988).

 With regard to Criner's claim that Anthem impermissibly terminated coverage, Anthem asserts that its actions were authorized by three provisions. *First*, Anthem notes that the contract indicates that "Anthem Senior Advantage's contract with HCFA is renewed on an annual basis. At the end of each contract year, the contract can be ended by either Anthem Senior Advantage or HCFA. If the contract ends for any reason, [the insured] would receive notice 60 days before the end of the contract." (Ohio Cert., p. iv). *Second*, it cites to the "Cessation of Operations" provision, which provides:

> In the event of the cessation of operations or dissolution of Anthem Senior Advantage, this Certificate will be terminated. You will receive notice 60 days before the Certificate is terminated. Please note, if the Certificate terminates, your coverage will also end. In that event, Anthem will explain your options at that time. For example, there may be other health plans in the area for you to join if you wish. Or, you may wish to return to traditional Medicare and possibly obtain supplemental insurance. Anthem would arrange for you to obtain, without health screening or a waiting period, a supplemental health insurance policy to cover Medicare coinsurance and deductibles. Whether you enroll in another prepaid health plan or not, there would be no gap in coverage.

(Ohio Cert., p. 33 ¶ F). *Third*, Anthem cites to the provision under which policyholders could be involuntarily disenrolled from the plan. One such basis for involuntary termination of coverage is if "[t]he contract between Anthem Senior Advantage and HCFA is terminated." (*Id.*, p. 37). Anthem asserts that the HCFA stated, in its Medicare HMO guidelines, that "HCFA views service area reductions as partial contract terminations or nonrenewals." Gross Aff. # 1, Ex. 5. Based on that statement, Anthem argues that its action of reducing the number of counties served by ASA was a "termination" of the contract between Anthem and HCFA. Thus, it continues, the Cessation of Operations and the Involuntary Termination provisions were triggered.

Upon review of Ohio Certificate, the Court concludes that there is a genuine issue of material fact as to whether the policy permitted Anthem selectively to terminate Plaintiffs' coverage. Although Anthem ceased operations in various counties, the Ohio Certificate does not specify whether that provision is triggered by cessation in a particular geographic area, or cessation of ASA's operations in their entirety. While the contract does not say that Anthem cannot cease its operations in certain areas, the converse is also true. Either interpretation is reasonable, as is reflected by the following exchange during Mr. Criner's deposition.

Q. Just focusing on the cessation of operations aspect, do you understand this to mean if [Anthem] ceases operations in a county like Clark County that the certificate is terminated for you?

A. I don't think so, no.

Q. Why not?

* * *

A. Because it doesn't stipulate in counties. They're saying here that if the company dissolves itself the certificate will be terminated. This certificate means the company—if it's dissolved, then the certificate is no good no where [sic].

* * *

Q. Do you understand that I'm talking about the part that says cessation of opera-

tions? Do you understand that, Mr. Criner?

A. Yeah. It means when they quit, stop.

Q. Okay. Has Anthem stopped in Clark County?

A. Well, they will the 1st of January.

\* \* \*

Q. And as of 1st of January when they stop or quit their operations there, do you understand that this certificate terminates?

A. I still don't think this pertains to our subject right now because you're talking about dropping a county.

\* \* \*

Q. Are you saying that you think that this drop pertains to stopping all operations?

A. Right.

Q. Okay. And where in this paragraph does it say stopping all operations?

A. Well, just the same thing. Where in this paragraph does it say counties?

(Criner Depo. at 44–47). As with the cessation of operations language, there is no language in Anthem's policy that indicates that Anthem's contract with HCFA may be partially terminated, i.e., that the contract could be terminated for one geographic location but remain in effect for others. As quoted by Defendant, the Ohio Certificate indicates that the ASA entered into *a* contract with HCFA and that *the* contract can be ended by either Anthem Senior Advantage or HCFA at the end of each contract year (Ohio Certificate, p. iv). Construing the contract in the light most favorable to Plaintiffs, the language of the Ohio Certificate implies that the contract would be ended or renewed in toto, not piecemeal.

Accordingly, the Court concludes that there is a genuine issue of material fact whether the ASA Plan was "terminated" or "ceased to operate," within the meaning of the Ohio Certificate, when Anthem decided to cease offering the plan in selected Ohio counties.[11] Thus, there is a genuine issue of material fact as to whether Anthem could involuntarily disenroll Plaintiffs, on the ground that the contract between ASA and HCFA was terminated. Defendant's Motion for Summary Judgment on Criner's breach of contract claim is OVERRULED.

As for Thompson's claims that Anthem breached the insurance contract by increasing his premium and decreasing his benefits, Anthem cites to the "Amendments" provision of the policy, which states, in pertinent part:

> The Plan may change the services, rates, or other terms of this Certificate. Anthem will give you at least 30 days advance written notice of any change. We will mail the notice to you at your address as shown on our records.

(Ohio Cert., p. 33 ¶ E). Thus, it argues, it was permitted, according to the terms of the plan, to increase "rates" and change the "services" and "other terms," with written notice. Plaintiffs respond that Anthem's letter to Thompson, dated May 23, 1998, notifying him of the impending termination of his coverage, constituted an anticipatory breach. They further state that the imposition of higher premiums and reduced benefits as a condition for avoiding involuntary termination constitutes a breach of the Ohio Certificate. With regard to page 33, paragraph E, Plaintiffs assert that neither "services" nor "rates" refers to premiums.

11. Anthem asserts that the HCFA considers Defendant's service area reduction to be a partial contract termination. They therefore argue that, because HCFA has so construed Defendant's actions, the Court should apply HCFA's construction to the Ohio Certificate. In other words, Defendant argues that HCFA considers Anthem's cessation of operations in some counties to constitute a partial contract termination, which triggers the involuntary disenrollment provision, and the Ohio Certificate should be construed to re-

flect that interpretation. Defendant's reference to the HCFA's Medicare HMO guidelines constitutes parol evidence that indicates Anthem's basis for including partial terminations within its definition of "termination." There is no evidence, however, that Plaintiffs were aware that HCFA considers a service area reduction to constitute a partial termination, such that the termination provisions in the contracts with insureds would apply.

The Ohio Certificate sets forth in detail the services that are covered by the ASA Plan. As stated in the "Covered Services" section:

> The Health Care Benefits section identifies specific benefits that are covered by the Plan. Some services are covered in full by these benefits. You share in the cost of some services through a Copayment. Services may have limitations. Certain services are not covered. The Schedule of Benefits you receive with this Certificate states benefits limitations which include Copayment amounts and coverage limits.

(Ohio Cert., p. 14).[12] This section, in conjunction with paragraph E of page 33, clearly and unambiguously provides that Anthem may alter the benefits, *i.e.*, "services", that it would provide.

On its face, the contract is silent as to the issue of premiums. Premiums are not defined in the Definitions section (p. 3), nor is there any mention of the potential requirement to pay them to Anthem.[13] However, premiums reasonably fall within the meaning of the term, "rates". Moreover, Anthem had the authority to modify "other terms." Although Plaintiffs' suggest that the phrase "other terms" is restricted to those items defined in pages 3 to 8 of the contract, a plain reading of the Ohio Certificate indicates that "other terms" refers to all non-rate and non-services provisions within the Contract. Neither rates nor services are defined in pages 3 through 8, and large portions of the Ohio Certificate detail the co-payments and benefits provided. Thus, restricting "other terms" to the terms defined in the Definitions provision is an unreasonable interpretation. Accordingly, the Court concludes that there is a no genuine issue of material fact as to whether Anthem could, pursuant to the terms of the Ohio Certificate, institute new premiums. It clearly could do so, as long as the requisite notice was given. Accordingly, Defendant is entitled to summary judgment on this issue. Anthem's Motion for Summary Judgment on the breach of contract claims is SUSTAINED in PART and OVERRULED in PART.

## C. *Promissory Estoppel (Count Three)*

To recover under the doctrine of promissory estoppel, a plaintiff must establish that: (1) the defendant made a clear, unambiguous promise; (2) the defendant should have reasonably expected the promise to induce action or forbearance on the part of the plaintiff; (3) the promise actually induced action or forbearance that was detrimental to the plaintiff; and (4) enforcement of the promise is necessary to avoid injustice. *Fisher v. Trinova Corp.*, No. 96–3918, 1998 WL 774111 at *9 (6th Cir. Oct.13, 1998); *Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 488 (6th Cir.1995); *Wing v. Anchor Media, Ltd.*, 59 Ohio St.3d 108, 570 N.E.2d 1095, 1098 (1991); *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). Defendant argues that there is no evidence that any of its representatives made a promise of continuing coverage upon which Plaintiffs could rely. In support of that argument, Anthem cites to Thompson's deposition testimony, in which he indicates that everything he knew about the ASA Plan was learned in connection with his wife's application for a policy (Thompson Dep. at 18). Thompson further indicated that the basis for his belief that his policy terms could not be changed or terminated was an Anthem Medicare Supplement brochure that used the phrase "guaranteed renewable." (*id.* 24–25) However, the Anthem Medicare Supplement program is different from the ASA Plan (Gross 2d Aff. ¶ 5). Thus, Defendant argues, Thompson received no promises about the ASA Plan from Anthem representatives and his reliance on statements in the supplemental program brochure was not reasonable.

As to Criner, Anthem notes that Criner's knowledge of the ASA Plan was based on his original telephone call to Plan's "800" number in Cincinnati (Criner Dep. at 2). There is no evidence that the representative who spoke with Criner at that time made any representation upon which he relied and subsequently suffered an injury therefrom. In

---

**12.** The benefits which are covered under the Ohio Certificate are specified in pages 16 through 29.

**13.** The Eligibility, Enrollment, and Effective Date provision indicates that participants must continue to pay their Medicare Part B premium.

his deposition, Criner indicated that he attended an informational meeting at the Fairborn Senior Citizens Center, at which further representations were made (*id.* 30–31). However, he further states that he had already made up his mind to join the ASA Plan and had submitted his application at the time of the meeting (*id.*). Thus, Anthem argues, the meeting was irrelevant to his decision to join the plan. Upon review of the evidence, the Court finds no evidence to support Plaintiffs' claim that Anthem made promises upon which they relied to their detriment.[14] Rather, the undisputed evidence indicates that Anthem made no promises of guaranteed continual coverage. The Court further agrees with Anthem that the statements made in Anthem Medicare Supplement brochure and the statements made at the meeting at the Fairborn Senior Citizens Center cannot form a reasonable basis for reliance herein. Accordingly, Defendant's Motion for Summary Judgment on Plaintiffs' promissory estoppel claim is SUSTAINED.

### D. Breach of Fiduciary Duty (Count Four)

Anthem asserts that its fiduciary duty arose due to the contract between it and Plaintiffs. It argues that Plaintiffs' claim for breach of fiduciary duty must fail, however, because its actions were authorized by the contract. Plaintiffs argue that, because Anthem breached its contract with them, its actions constitute a breach of fiduciary duty.

 "In Ohio, an insurance company has a fiduciary responsibility toward its insured to act in good faith toward its insured in carrying out its duties under the contract." *Motorists Mut. Ins. Co. v. Said,* 63 Ohio St.3d 690, 694, 590 N.E.2d 1228, 1232 (1992), *overruled in part on other grounds, Zoppo v. Homestead Ins. Co.,* 71 Ohio St.3d 552, 644 N.E.2d 397 (1994), paragraph one of the syllabus. With regard to Thompson's breach of

contract claim, the Court has concluded, *supra,* that Anthem was permitted, under the terms of the Ohio Certificate, to increase his premium and to decrease his benefits. Because Defendant was permitted to take these actions, its conduct cannot constitute a breach of fiduciary duty. Defendant's Motion for Summary Judgment on Thompson's breach of fiduciary duty claim is SUSTAINED.

 Turning to Mr. Criner, as stated in this Court's analysis of his breach of contract claim, Defendant has not demonstrated that its actions in terminating the ASA Plan were within the terms of the contract. Accordingly, there is a genuine issue of material fact as to whether Anthem breached its fiduciary duty by terminating its contract with ASA Plan insureds. Defendant has not shown that it is entitled to summary judgment on this claim. Thus, Defendant's Motion for Summary Judgment on Plaintiffs' breach of fiduciary duty claim is SUSTAINED in PART and OVERRULED in PART.

### E. Bad Faith (Count Five)

Plaintiffs' claim of bad faith states that "Anthem's termination of the Senior Advantage Plan for Plaintiffs and Class members is not predicated upon circumstances that furnish reasonable justification therefor, and therefore constitutes an act of bad faith on the part of Anthem." (2d A.Compl.¶ 45). Anthem claims that it is entitled to summary judgment on Plaintiffs' bad faith claims for two reasons. *First,* it argues that it had a reasonable justification to terminate or alter coverage, because such actions are permitted by the terms of the Ohio Certificate. *Second,* it asserts that Ohio law does not recognize a bad faith claim for situations other than failure to pay a claim. Plaintiffs respond that involuntary disenrollment due to possible reduced profits constitutes bad faith.[15]

---

14. Plaintiffs have not responded to Defendant's argument with regard to their promissory estoppel claim.

15. Plaintiffs also assert that Anthem acted in bad faith when it required them to pay a monthly premium to avoid disenrollment. However, Plaintiffs do not complain of such action as part

of their bad faith claim in the Second Amended Complaint. Moreover, because the Ohio Certificate clearly permits Anthem to modify the contract, *see supra,* such an action could not constitute bad faith.

302

The Ohio Supreme Court has recognized the tort of insurer bad faith when an insurer refuses to pay a valid claim. *Zoppo, supra* (paragraph one of the syllabus). As stated in *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315, 1319 (1983), "based on the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action against the insurer." However, the claim against the insurance carrier will survive only if the record shows that there were no circumstances in the case which could be viewed as creating a reasonable justification for that carrier's actions. *Zoppo*, 644 N.E.2d 397.

Turning to Defendant's arguments, Anthem argues that Ohio courts have not extended the tort of bad faith to situations other than failure or refusal to pay a claim. It notes that Plaintiffs have cited no case law to the contrary. Upon review of Ohio cases, this Court likewise has discovered a limited number of cases venturing beyond failure to pay a claim. However, as quoted above, the Ohio Supreme Court has permitted claims of bad faith resulting from the "handling" of claims, not just their payment. *Hoskins, supra.* Certainly, the termination of an insurance contract is a statement that the insurer will no longer settle any future claims. In addition, various Ohio courts of appeals have addressed bad faith claims, stemming from actions not directly related to the payment of claims. *See Wodrich v. Farmers Ins. of Columbus, Inc.*, 1999 WL 317448 (Ohio App.2d Dist. May 21, 1999) (plaintiffs asserted that insurer acted in bad faith when advocating tort reform which would limit its liability); *Red Head Brass Inc. v. Buckeye Union Ins. Co.*, 135 Ohio App.3d 616, 735 N.E.2d 48 (1999) (plaintiffs asserted that insurer breach duty of good faith when it failed to disclose potential conflict of interest). The Court therefore concludes that an insurer's duty of good faith extends to the termination of an insured's contract. Thus, the Court finds unpersuasive Anthem's argument that Plaintiffs cannot state a claim for bad faith, based on wrongful termination of their ASA Plan contracts.

Defendant argues that, even if the duty of good faith extends to contract terminations, it is entitled to summary judgment, because its actions were based on reasonable justifications. "Mere refusal to pay insurance is not, in itself, conclusive of bad faith." But when an insured insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, " * * * such a belief may not be an arbitrary or capricious one. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefor." *Hart v. Republic Mutual Ins. Co.*, 152 Ohio St. 185, 188, 87 N.E.2d 347 (1949). Defendant asserts that its actions were justified, because they were authorized by the contract. With regard to Mr. Thompson's claims, Anthem is correct, as discussed, *supra.* However, with regard to Mr. Crider's claims, Defendant has not demonstrated that its actions were permitted by the terms of the Ohio Certificate. Accordingly, Anthem has not established that its actions were justified. Defendant's Motion for Summary Judgment on Plaintiffs' bad faith claim is SUSTAINED in PART and OVERRULED in PART.

### F. Fraud (Count Six)

To state a claim for fraud in Ohio, a plaintiff must establish: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 490–91, 737 N.E.2d 68 (1999), citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986), paragraph two of the syllabus.

Plaintiffs argue that Anthem concealed the fact that it was planning to terminate coverage as of December 31, 1998. They state that Defendant's principal reason for involun-

tarily disenrolling thousands of ASA Plan insureds was the passage of the Balanced Budget Act of 1997, enacted on August 5, 1997, which reduced the amount of Anthem's anticipated earnings. Plaintiffs further assert that Defendant would have been on notice or reasonably should have known of this change in the law on or before its effective date, yet it continued to enroll new ASA Plan insureds in the counties covered by Anthem's planned service area reduction. Plaintiffs, therefore, contend that Anthem committed fraud by soliciting new enrollees at a time when it knew that those individuals likely would be involuntarily disenrolled due to reduced earnings.

Plaintiffs have not produced evidence to raise a genuine issue of material fact that Defendant fraudulently solicited new enrollees. According to Anthem's testimony on July 18, 1998, the decision to reduce its service area was made in Spring, 1998, after consideration of financial data and the likely effect of the Balanced Budget Act:

> Many have asked us why we did not terminate our participation in the program last year when BBA was passed by Congress. We did not have sufficient data or time to make a decision last fall. In the midst of the significant growth we were experiencing, it was more difficult to predict what actual claims costs would be. Typically Anthem will still receive claims related to an initial diagnosis for at least three months after the initial claim is filed. Unfortunately, HCFA historical claims data was not a reliable guide. In addition, Anthem's experience has been that seniors use health care more frequently during their transition to a managed care product with broader benefits. Because of this, Anthem did not have a complete financial picture of this product on which to make a decision with respect to the affected counties by November 1997 when our plan design for 1998 was filed with HCFA.

> Under the BBA, Anthem received the 1999 reimbursement rates for all counties in Ohio on March 1, 1998. We had until May 1 of this year to make changes to our service area for 1999. By this time we had a more complete picture of what our 1997

experience was. We notified HCFA of our request for a service area reduction on April 9th. Anthem finalized this decision on April 15th and filed its 1999 service area plan design with HCFA on May 1.

(Doc. # 41, Ex.C–2) (Testimony of Anthem in regards to Anthem Senior Advantage, House Insurance Committee, July 16, 1998). In her affidavit, Ms. Lynne Gross, Vice–President for Government Programs and Health Care Operations for Community Insurance Company, confirmed that the decision to withdraw the ASA Plan from certain counties was not reached until early 1998 (Gross 2d Aff. ¶ 6).

According to Plaintiffs, Thompson has been enrolled in the ASA Plan since June, 1997. Mr. Criner enrolled in August of 1997. Thus, both individuals joined prior to any decision by Anthem to cease providing the Plan. In fact, both joined prior to the enactment of the Balanced Budget Act. Thus, there is no evidence that Anthem, at the time of Plaintiffs' enrollment, knew and concealed from Plaintiffs the fact that they would likely be involuntarily disenrolled on December 31, 1998. Accordingly, there is no genuine issue of material fact as to whether Anthem concealed material facts upon which Plaintiffs relied, and Defendant is entitled to judgment as a matter of law. Defendant's Motion for Summary Judgment on Plaintiffs' fraud claim is SUSTAINED.

### G. Punitive Damages (Count Seven)

Defendant seeks summary judgment on the Plaintiffs' request for punitive damages, on the ground that no viable tort claims exist. Mr. Crider's claims for breach of fiduciary duty and bad faith remain in this litigation. Accordingly, Defendant is not entitled to summary judgment on his claim for punitive damages for those torts. Anthem's Motion for Summary Judgment on Plaintiffs' request for punitive damages is OVERRULED in PART and SUSTAINED in PART.

### H. Specific Performance (Count Two), Declaratory Judgment (Count Eight), Injunctive Relief (Count Nine)

In its Motion, Defendant seeks summary judgment on Plaintiffs' remaining

claims for specific performance, declaratory judgment, and injunctive relief. In their Second Amended Complaint, Plaintiffs state that they and class members are entitled to specific performance of their respective contracts with Anthem as a remedy for Anthem's cancellation of its contracts in Brown, Darke, Greene, Miami, Preble and Shelby Counties (2d A.Compl.¶ 36–37). Plaintiffs further sought an injunction to prevent termination of coverage in those counties and a declaratory judgment that such a termination would be impermissible under the Ohio Certificate.

Plaintiffs repeatedly acknowledge that Defendant has reinstated the ASA Plan in those counties (*id.* ¶ 16, Doc. # 41 at 19). However, in their Opposition Memorandum, they assert that specific performance, injunctive relief, and declaratory judgment remain viable alternatives "to keep [Anthem] from reneging on the concessions it has been forced to make to date." (Doc. # 41 at 19–20). The Court disagrees. At the time that the Second Amended Complaint was filed, Defendant had already chosen to continue the ASA Plan in the six counties where no alternative Medicare HMO was offered, plus three additional counties. Thus, Plaintiffs' had no active controversy at that time regarding the previously proposed termination in those nine counties, and the issue appears to be moot.[16] Defendant is entitled to summary judgment on Plaintiffs' requests for declaratory judgment, injunction, and specific performance, requiring Defendant to continue coverage in Brown, Darke, Greene, Miami, Preble and Shelby Counties.[17]

## I. *Summary*

In summary, Defendant's Motion for Summary Judgment is OVERRULED in PART and SUSTAINED in PART. Defendant is entitled to summary judgment on Plaintiffs' claims for breach of contract, based on a change in terms in the reinstated counties (Thompson's/subclass # 1's Claim)(Portion of Count One); specific performance (Count Two); promissory estoppel (Count Three); breach of fiduciary duty, based on a change in terms in the reinstated counties (Thompson's/ subclass # 1's Claim) (Portion of Count Four); bad faith, based on a change in terms in the reinstated counties (Thompson's/subclass # 1's Claim) (Portion of Count Five); fraud (Count Six); declaratory judgment (Count Eight); and injunctive relief (Count Nine).[18] Defendant is also entitled to summary judgment on Plaintiffs' request for punitive damages (Count Seven), with respect to their claims for promissory estoppel and fraud and Mr. Thompson's claims. Plaintiffs' claims for breach of contract, based on the termination of the ASA Plan (Crider's/subclass # 2's Claim) (Portion of Count One), breach of fiduciary duty, based on the termination of the ASA Plan (Crider's/subclass # 2's Claim) (Portion of Count Four), and bad faith, based on the termination of the ASA Plan (Crider's/subclass # 2's Claim) (Portion of Count Five) remain. Plaintiffs' request for punitive damages (Count Seven) also remains viable, with respect to Mr. Crider's breach of fiduciary duty and bad faith claims.

For the foregoing reasons, Plaintiffs' Motions to Strike (Doc. # 44–1) or, in the alter-

---

**16.** Courts have applied an exception to the mootness doctrine for cases that are capable of repetition yet evading review. The Supreme Court has stated that the capable-of-repetition doctrine applies only in exceptional situations, where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). Plaintiffs have not demonstrated that Anthem will likely again threaten to terminate its coverage in the reinstated counties, nor is there any basis to conclude that the time between any such termination and reinstatement is always so

short as to evade review. Thus, Plaintiffs have not shown that the capable-of-repetition doctrine is applicable herein.

**17.** The Court further questions whether specific performance and injunctive relief is a viable option for the counties in which coverage has been terminated. Anthem can only offer the ASA Plan in those counties which have been authorized by the HCFA. At present, Anthem's contract with HCFA does not permit it to operate in the terminated counties.

**18.** Because Defendant is entitled to summary judgment on all of subclass # 1's claims, no new class representative for that subclass is required.

native, to file a supplemental memorandum (Doc. # 44–2) are OVERRULED. Plaintiffs' Renewed Motion for Class Certification (Doc. # 34) is SUSTAINED in PART and OVERRULED in PART. Anthem's Motion for Summary Judgment (Doc. # 37) is likewise SUSTAINED in PART and OVERRULED in PART.

Counsel of record will take note that a telephone conference call will be had, beginning at 4:45 p.m., on Tuesday, October 15, 2002, for the purpose of setting a trial date on the liability issues herein and any other dates necessary to the resolution of this litigation.